City of Chicago, Appellee, v. Arthur Terminiello, Appellant.

Gen. No. 44,062.

18

Opinion filed June 25, 1947. Released for publication July 9, 1947.

MAXIMILIAN J. ST. GEORGE and ALBERT W. DILLING, both of Chicago, for appellant.

BARNET HODES, Corporation Counsel, for appellee; J. HERZL SEGAL, Head of Appeals and Review Division, A. A. PANTELIS and HARRY A. ISEBERG, Assistant Corporation Counsel, of counsel.

MR. JUSTICE FEINBERG delivered the opinion of the court.

The defendant was arrested upon a sworn complaint, filed in the Municipal Court of Chicago, charging in the language of the ordinance of Chicago that on the 7th day of February, 1946, he did make, or aid in making, an improper noise, riot, disturbance, breach of the peace or diversion tending to a breach of the peace, within the limits of the City, in violation of chapter 193, section 1 (1) of the Revised Code of 1939, as amended. Upon a trial with a jury, a verdict was returned finding him guilty and assessing a fine against him of $100. After motions for a new trial, for judgment notwithstanding the verdict and in arrest of judgment were overruled, the court entered judgment upon the verdict, and defendant appeals.

A direct appeal was taken by the defendant to the Supreme Court. *City of Chicago v. Terminiello,* 396 Ill. 41. The Supreme Court, holding that no constitutional question was involved, and there being no certificate by the trial judge that the validity of an ordinance was involved, transferred the cause to this court for determination.

The charge grows out of a speech delivered by the defendant and his conduct at a meeting held on February 7, 1946, in the auditorium of a building operated by the West End Woman's Club, located at the northeast corner of Monroe street and Ashland avenue in Chicago. It was rented by those in charge of the

meeting. One of the witnesses for defendant, who was stationed at the entrance to the auditorium to collect the tickets of admission, estimated the number of people in the auditorium to be from 800 to 1,000. It appears from the record that a printed invitation was distributed to announce this meeting, signed by one Gerald L. K. Smith and mailed to people from a mailing list. Accompanying this invitation were cards of admission to be presented at the place of meeting. The invitation is as follows:

"THE FATHER COUGHLIN OF THE SOUTH
  FATHER TERMINIELLO WILL SPEAK HERE.

Dear Patriotic Friend:

Father Arthur W. Terminiello, the radio Priest of the South, has agreed to speak in Chicago on the 7th of February. This young Priest, age 39, is responsible more than any other single individual in America for bringing about the investigation of the Pearl Harbor scandal.

Father Terminiello has been referred to by many as the Father Coughlin of the South. The same people who hate Father Coughlin hate Father Terminiello. They have persecuted him, hounded him, threatened him, but he has remained unaffected by their anti-Christian campaign against him. You will hear all sorts of reports concerning Father Terminiello. But remember that he is a Priest in good standing and a fearless lover of Christ and America. His dynamic and historic radio address entitled 'The Cross of War' has had a circulation running up into millions.

Father Terminiello is a true Christian Nationalist. He is editor of THE CRUSADER. He is the director of a rapidly growing movement known as The Union of Christian Crusaders.

I wish it were possible for me to preside over a meeting where I could introduce Father Charles E. Coughlin. Unable to do this as yet, I consider that

Father Terminiello is the best, if not the only, substitute that can be found in the United States.

I enclose herewith a few extra cards. These cards will go like hot cakes! Everyone you see will want them. Therefore, make wise distribution of them.

A special committee has rented the auditorium of the West End Woman's Club. Although it has ample facilities we expect it to be well filled to hear the courageous message of this young Priest. Doubtless what he has to say will be one of the boldest and bravest *public statements* to which you have ever listened. The slogan should be: Christ or Chaos—Christian Nationalism or World Communism—Which?

Sincerely yours,<br>Gerald L. K. Smith.'' (Italics ours.)

The card of admission, inclosed with the invitation, reads as follows:

''This card will admit bearer and one friend to hear Father Arthur W. Terminiello (The Father Coughlin of the South) West End Woman's Club.

37 S. Ashland Blvd. (cor. Monroe) Chicago, Illinois

Thursday, February 7, 1946 . . . 8 p.m.

Subject: CHRISTIANS, AWAKE!

Dealing with the most dangerous and dynamic issues of the hour. The most fearless speech since the war.

Father Terminiello will be introduced by Gerald L. K. Smith. Auspices: Christian Veterans of America, Fredrick Kister, Director.

Admission By Card Only.''

The principal contentions of the defendant, upon which he seeks a reversal, are: (1) that in order for him to be found guilty of the charge in the complaint, the speech of the defendant would necessarily have to be a public utterance at a public meeting, and that

this meeting in question was a private one; (2) that the speech delivered by him was one he had a right to deliver and was protected by the First and Fourteenth Amendments to the Constitution of the United States, and by the Constitution of Illinois; that what he said at the meeting, and the manner in which he delivered it, was not a breach of the peace or diversion tending to a breach of the peace and, therefore, did not violate the ordinance.

As to the first contention, whether the meeting was a public meeting, we find in the record the following facts: that the hall was filled to capacity, with about 200 to 300 persons having tickets of admission unable to get in, some having obtained admission who were not desired by those in charge of the meeting; that Ira Latimer testified that he was executive secretary of the Chicago Civil Liberties Committee, with which he was connected for 10 years and prior to which he taught social science at Columbia Teachers College in Chicago and LeMoyne College in Memphis; that he received through the mail at his home the invitation together with 7 or 8 tickets of admission, each ticket permitting admission of two persons; that the invitation was addressed to an old address at which he had not lived for a year prior to receiving it. He attended as an observer for the Chicago Civil Liberties Committee.

Karel, a witness for the plaintiff, testified that he has been in the printing business for 15 years, and prior to that was a druggist; that he entered by ticket, which was taken up at the door.

Lucille McVicker Lipman, a witness for plaintiff, testified that a friend had 2 tickets and took her to this meeting; that these tickets were taken up at the door by Mrs. Kister.

Marybelle McManaman, a witness for defendant, testified that she received the invitation to the meeting, with 4 or 5 tickets inclosed.

Mrs. Kister, a witness for defendant, testified that she took up all of the tickets and admitted everyone at the door; that invitations were sent out, and "the tickets were just sent to people that we knew, supposedly"; that they tried to refuse admittance to certain persons, even though they had tickets of admission; that she did not have charge of mailing the tickets, nor did she check the mailing list; that she did not know how many tickets were mailed out.

Donald J. McDaniel, a witness for defendant, testified that he assisted at the door in taking up the tickets, and he estimated there were between 800 and 1,000 people in the hall; that he was told the capacity of the hall was 700 or 800; that it was filled well to capacity, and they would not let any more in; that there were some standing in the rear; that the doors were closed by the police; that 200 to 300 persons who had tickets were turned away because the place was filled; that he was at his station practically all of the time of the meeting. On cross-examination he testified: "I cannot say that I turned away anyone."

Clara Schneider, a witness for defendant, testified that she and her husband were on the mailing list.

The cases cited by plaintiff are not helpful as to whether this meeting was a public one. All of them, in one form or another, involve the question as to what is a public place, such as *Finnem v. State,* 115 Ala. 106, or what is public property, or the construction of the word "public," such as *State ex rel. Maher v. Baker,* 88 Ohio St. 165, 102 N. E. 732. As was said in *People v. Johnson,* 86 Mich. 175, 177:

"In general terms the offense is a violation of public order, a disturbance of the public tranquillity, by any act or conduct inciting to violence, or tending to provoke or excite others to break the peace. *Each case where the offense is charged must depend upon the time, place, and circumstances of the act."* (Italics ours.)

*City of Bloomington v. Richardson*, 38 Ill. App. 60, though not in point because the ordinance was directed at control of public gatherings or meetings of any kind on the public streets or alleys of the City of Bloomington, in defining "public meeting" within the meaning of the ordinance, uses this language:

"This implies, and truly enough, that a private meeting may be held on a public place and a public meeting on a private place."

We have examined the cases cited by the defendant, and we have no quarrel with the principles laid down by these cases that the declaration must be a public one, but none of them involves the question whether, under all the circumstances, the type of meeting in the instant case was a public or private one.

None of them undertakes to declare when a meeting, though held in a private hall or auditorium, becomes a public one. The Standard Dictionary defines "public" as "something done or made in public or without concealment; hence, such as to be seen, known or noted by all or by many . . . as a public statement or act."

We are of the opinion that the showing made as to the size and composition of the meeting, the circumstances surrounding those who were admitted and those holding tickets who were unable to get in, the form of invitation, and the rather liberal and indiscriminate way in which the tickets were distributed, give this meeting the necessary characteristics of a public one. The defendant and those in charge of the meeting were in a position by evidence in their control to rebut the *prima facie* proof that this was a public meeting, by showing how the mailing list was made up, how many invitations and tickets were distributed, to establish that the meeting was at least intended to be a private one, limited to membership in some private organization or to a limited group or set, dis-

criminately selected, and not, as in the instant case, a widespread distribution of tickets that entitled each holder to bring a friend. In this connection we should bear in mind the statement contained in the invitation: ''I enclose herewith a few extra cards. These cards will go like hot cakes! Everyone you see will want them. Therefore, make wise distribution of them.'' No such rebuttable evidence was offered by defendant. We come to the next question, whether his conduct and his speech constituted a breach of the peace or diversion tending to a breach of the peace, and whether it is protected by the constitutional guarantee of freedom of speech.

In order to clearly understand the conditions as they prevailed at the time he delivered his speech, it becomes necessary to review the evidence of the scene, not only on the outside of the meeting hall but the inside as well, inasmuch as it has a direct and important bearing upon whether the speech was inflammatory, indecent, or profane, and coupled with abusive epithets and tended to incite others to a breach of the peace.

From the testimony of all of the witnesses for defendant, we find proof of the following facts: that around the hour of 6:30 p.m. of the day of the meeting, a crowd gathered in front of the building, and a picket line was formed by those in apparent protest to the appearance of the defendant and the holding of such a meeting; that the size of the picket line was described variously from 250 to 500 in number, composed of men, women and young people. It was stated by some of the witnesses that the size of the crowd gathered in front of the building was around 1,500 in number. This crowd and the picket line, hereinafter detailed, were there before the start of the meeting. About 200 to 300 people who had tickets for admission could not get in because the hall was filled. Some who had tickets and who those in charge of the door tried to

keep out, succeeded in getting in. The witness Karel, for the plaintiff, was one of those. He was known to the attendant at the door. A cordon of police was stationed around the outside of the meeting hall before the start of the meeting, and 6 or 8 police officers, some in uniform and others not, were stationed within the hall at the front and rear entrances. The picket line carried banners with inscriptions condemnatory of the meeting, and it was so formed as to obstruct and interfere with the free access to the meeting by those entitled to enter. The crowd around the building was a surging, howling mob, hurling epithets at those seeking to get into the meeting. Groups who came together for the meeting were separated by the mob and were unable to remain together or enter the meeting together. The pushing and milling crowd tried to tear their clothes off. One young woman's coat was torn off her. Some had to be assisted into the meeting hall by policemen. Before the defendant spoke, those inside the hall could hear the loud noises and the yelling and hollering on the outside. They could hear those on the outside yell, "Fascists," "Hitlers" and other names, curse words like "damned Fascists." Bricks were thrown through the window panes before the speaking started and during the speaking. About 28 windows were broken. The street was black with people on both sides for at least a block either way of the building. Bottles were thrown, "stink" bombs and brickbats were hurled against the building. Missiles of all kinds were flying through the air. A group of 40 boys rushed the police stationed on the staircase and knocked some of them down. About 17 of the group were arrested. Throughout the meeting they kept breaking the windows of the meeting hall. The howling at times drowned out the speaker's voice. The rear door was being bashed in, the mob trying to crash it in under the speaker's platform. There were a number of attempts to rush the meeting. At one

time a brick came through the window, causing the shade to come out, and many people had to jump up. There was a terrific smash, and everybody jumped up. One of the witnesses testified that he heard the crowd hollering, "Hang Smith, kill Smith," and making a chanting noise. Still another witness for the defendant testified that you could not stand the stench bomb odor; that the windows were being smashed throughout the time the defendant spoke.

The defendant testified that Smith invited him to speak to this meeting under the auspices of one of the ladies' clubs; that he arrived at the meeting with Smith and his wife and Mr. Kister, about 15 or 20 minutes past 8 p. m., in a hired car; that the car stopped at the front entrance and a crowd of 300 or 400 congregated, shouting, cursing and picketing; that they had to form a flying wedge to get through the picket line, and that police escorted them to the building; that the pickets called out to them, "God damned Fascists, Nazis, ought to hang the so and sos"; that when he entered the building he heard the howls of the people outside; that a number of times the door was partly broken through; that when the police looked out and threatened to arrest the wrongdoers, something was thrown at the officers, including ice picks and rocks, that the cursing on the outside could be heard audibly at times. He also testified that there was a general commotion, all kinds of noises and violence, all from the outside. Stones and bricks were thrown in all the time. He testified he did not give a prepared speech; that he just prepared an outline and cut a good deal of it.

There is conflict in the testimony as to all defendant said in his speech and as to all that occurred within the meeting hall. It appears that a shorthand reporter was employed to report the meeting. She produced her shorthand notes at the trial, together with the transcription of her notes. The transcript of defend-

ant's speech by agreement was admitted in evidence. His speech is too lengthy to quote in full, but by many excerpts taken from the transcript we shall point out what defendant said, which clearly support the view we take of his speech and his conduct. He opened his speech with the following statement: "Now, I am going to whisper my greetings to you, Fellow Christians. I will interpret it. I said, 'Fellow Christians,' and I suppose there are some of the *scum* got in by mistake, so I want to tell a story about the scum. . . . Now, my friends, nothing you hear tonight so far, nothing that I would say can begin to express the contempt I have for that howling mob on the outside. . . . *And nothing I could say tonight could begin to express the contempt I have for the slimy scum that got in by mistake.* . . . The subject I want to talk to you tonight about is the attempt that is going on right outside this hall tonight, the attempt that is going on to destroy America by revolution. . . . when I began to preach about this menace of America, I was told by our own people, 'It can't happen here. Shut up; it can't happen here. Why talk about those things.' . . . It is happening here, and it only depends upon you, good people, who are here tonight, depends upon all of us together, as Mr. Smith said. The tide is changing, and if you and I turn and run from that tide, we will all be drowned in this tidal wave of Communism which is going over the world. . . . I am not going to talk to you about the menace of Communism, which is already accomplished, in Russia, where from eight to fifteen million people were murdered in cold blood by their own countrymen, and millions more through Eastern Europe at the close of the war are being murdered by these murderous Russians, hurt, being raped and sent into slavery. *That is what they want for you, that howling mob outside.* . . . when we degenerate to the so-called Red democracy, we are degenerating to

the level of the *howling mob on the outside.* . . . 'We are in for a profound revolution. Those of us who realize the inevitableness of the revolution, and are anxious that it be gradual and bloodless instead of somewhat bloody. Of course, *if necessary, we will have it more bloody.*' . . . Now, all of this that is going on, all of this noise that you hear around, is part of a great plan to enrich a few at the expense of the many. . . . Didn't you ever read the Morgenthau plan for the starvation of little babies and pregnant women in Germany? Whatever could a child that is born have to do with Hitler or anyone else at the beginning of the war? Why should every child in Germany today not live to be more than two or three months of age? Because Morgenthau wants it that way, and so did F. D. R. . . . You will know who is behind it when I tell you the story of a doctor in Akron, Ohio. He boasted to a friend of mine within the last few days, while he was in the service of this country as a doctor, he and others of his kind made it a practice—now, this was not only one man—made it a practice to amputate the limbs of every German they came in contact with whenever they could get away with it; so, that they could never carry a gun. Imagine men of that caliber, sworn to serve this beautiful country of ours, why should we tolerate them? My friends, this moment someone reminded me of the plan to sterilize them. The nurses, they tell me are going to inject disease in them, syphilis and other diseases in every one that came there all of one race, all non-Christians. . . . Now, let me say, I am going to talk about—I almost said, about the Jews. Of course, I would not want to say that. However, I am going to talk about some Jews. I hope that—I am a Christian minister. We must take a Christian attitude. I don't want you to go from this hall with hatred in your heart for any person, for no person. I say to you, we must have the Christian attitude.

. . . . we must love every person, Germans and Jews, Italians and everybody. We must not love particularly the criminals among those people. . . . So it is with the Jews, we must condemn the criminals, even if they are Jews. We must condemn Communists wherever we find them, if they are Irish, German, Norwegian or Jews, they must be condemned. But the moment we point to a man and say that man is a Communist, or that his name happens to be Ginsberg, then, we are—considered to be anti-Semitic. . . . Now, this danger which we face—let us call them Zionist Jews if you will, let's call them atheistic, Communistic Jewish or Zionist Jews, then let us not fear to condemn them. (At this time there was a very loud noise as if something was being thrown into the building.) Don't be disturbed. That happened, by the way, while Mr. Gerald Smith was saying 'Our Father who art in heaven'; (Just then a rock went through the window.) Do you wonder they were persecuted in other countries in the world? And when we were in Cleveland, I hadn't run into this; I was not an old campaigner, like Mr. Smith. I haven't had the courage that he has day after day, and month after month, and year after year, to go out and face that same howling mob; and when I saw it for the first time in Cleveland, was where I saw it first, I thank God that I did it, because it brought home to me the realization of the danger you face. . . . How can we expect to save America and say that when I face that audience—that big line in Cleveland, I heard that pagan chant that you hear out there. You know I have always made a study of the pyschology, sociology of mob reaction. It is exemplified out there. Remember there has to be a leader to that mob. He is not out there. He is probably across the street, looking out the window. . . . There must be some to beat a cadence. Those mobs are chanting; that is the caveman's chant. They were trained to do it. They were trained this after-

noon. They are being led; *there will be violence.* That is why I say to you, men, don't you do it. Walk out of here dignified. The police will protect you. . . . We will not be tolerant of that mob out there. We are not going to be tolerant any longer. We are strong enough. We are not going to be tolerant of their smears any longer. We are going to stand up and dare them to smear us. We are not going to be tolerant any longer of their pagan eye-for-an-eye philosophy. . . . We must not lock ourselves in an upper room for fear of the Jews. I speak of the Communistic, Zionistic Jew, and those are not American Jews. We don't want them here; we want them to go back where they came from. We are going to stand one and all together and form a solid phalanx of courage and loyalty and strength, and oppose every attempt to breach freedom of speech in America, every attempt to dilute Christianity in America, every attempt to undermine the morality of America, every attempt to shed American blood to promote Zionism in America, every attempt to demoralize our America, every attempt to persecute our cross . . . ." (Italics ours.)

Some of the witnesses for the plaintiff testify to statements made by the defendant in his speech, which do not appear in the transcript admitted in evidence.

The witness, Lucille Lipman, for the plaintiff, testified that she heard defendant say in his speech that there were no words vile or low enough for him to express his contempt for the atheistic, communistic, Zionist Jews, who were picketing outside of the building, and there were no words low enough for those skunks of Jews that got in; that the Jews were godless; that they had a movement on in this country to destroy the Christian Republic; that we should not say that this country is a democracy, that it is now a democracy run by Communist Jews, turned over to them during Roosevelt's administration; that democ-

racy was nothing but mobocracy, and under a democracy these skunks outside of the building would be allowed to vote, under a republic they would not; that she heard defendant say that a non-Jewish doctor, who was in the occupation army in Germany, told him that they were cutting off the arms and legs of Germans, so that they could not have another war, and that Jewish nurses were inoculating German women and children with syphilis and typhus germs and other disease germs.

The witness Latimer said that he heard the defendant in his speech refer to those who were supposedly amputating the limbs of all Germans they could get hold of, as non-Christian nurses and non-Christian doctors.

The transcript of the shorthand reporter, appearing in this record, does not purport to record everything that was said or everything that occurred at the meeting. The transcript does not contain the speeches of Gerald L. K. Smith or Mr. Kister, both of whom preceded the defendant in the speaking program. It does contain a statement by Mr. Smith that they were going to take up an offering for defendant, and that there was discussion to stimulate the offering, which was not reported in the transcript. The transcript contains only the speech of the defendant. That the shorthand reporter was not accurate in her transcription is clearly disclosed by the many inaccuracies defendant pointed out while on the witness stand and which, by agreement of counsel, were corrected in the transcript. It is not surprising if she did not include everything that transpired at the meeting, nor that she did not get all that was said by defendant in his speech. It is to be expected that she could, under such circumstances, fail to get all that was said, when there was so much confusion, turmoil and chaos, missiles thrown and windows broken.

Mrs. Dilling, for the defense, who was sitting on the platform during the meeting, testified that while the defendant was speaking the howling sometimes drowned out the speaker's voice. She heard someone in the rear of the hall get up and say, "You are a God damned liar"; that the disturber was ushered out by the police. That statement does not appear in the transcript of the shorthand reporter.

Another witness for defendant, Florence Griesel, testified that she heard as much of the defendant's speech as she could with the noise going on in the back of the hall and trying to get in; that "There were times when I could not hear very much for the missiles outside."

Many of the witnesses for defendant testified that they did not hear some of the things the plaintiff's witnesses testified they heard as a spontaneous reaction during the speech of defendant. The witness Lucille McVicker Lipman testified that when the defendant made the statement that there was no crime too great for the Jews to commit, the woman next to her said, "Yes, the Jews are all killers, murderers. If we don't kill them first, they will kill us"; and that when he made reference to the Jewish nurses inoculating German women and children with syphilis and typhus germs and other disease germs, she heard people around her say, "Oh, that is terrible," "That is a terrible thing"; that at another point in his speech she heard one in the audience say that if the Jews were not killed first, they would kill the Christians.

Ira Latimer testified that during the speech of the defendant, when he made reference to the story of the non-Christian doctors and nurses, he heard expressions of anger from the audience; that he heard a man in the back of him say that the Jews, "niggers" and Catholics would have to be gotten rid of; that at that point one man was ejected from the hall at the instance

of a number of women, who pointed to him and appeared to be in conversation with him; that he heard various howls, hoots, cries and shouts at various points in his speech; that he heard comments by people in the hall during the course of the speech; that when defendant spoke of the slimy scum and skunks, he heard people in the hall shout and cry out, "Tell them, Father," or "That is right." On cross-examination he testified that the audience was not calm; that they were disturbed and angry.

Karel, a witness for the plaintiff, testified that when he heard the defendant say that the Zionistic Jews were threatening to undermine our country and should all be sent back to Russia where they came from, he heard people around him in the audience holler, "Yes, send the Jews back to Russia. Kill the Jews"; "Kill the Jews"; "Dirty Kikes"; that when defendant referred to the Morgenthau plan to starve the German women and children, he heard some of the audience say, "They ought to starve the Jews," "They ought to kill Morgenthau," "They ought to do the same thing to him that he is doing to the Germans"; that he did not yell out, "You are a God damned liar," but that he heard someone get up and make that statement; that on every occasion, when the people stood up while defendant was speaking, they applauded and they made violent shouts, such as "Dirty kike, kill the Jew, send them back to Russia."

Whether these witnesses heard what they claimed in their testimony, and how much reliance could be placed upon their testimony, was clearly within the province of the jury, who heard and saw all the witnesses. It is not for us upon this record to suggest that the jury should have believed the witnesses for the defendant and not those for the plaintiff, especially when there is so little conflict upon material matters. As we have pointed out, there is much corroboration of the plaintiff's witnesses as to

what they heard and saw of the happenings on the outside and inside of the meeting hall.

It was in this setting and surrounding atmosphere, an atmosphere full of tenseness, mob excitement, with an audience, as we have pointed out, stirred to emotional reaction, that the defendant delivered his speech. The jury heard from the defendant that he had previously had difficulty of the same character in the City of Cleveland, where he undertook to address a meeting and was threatened and surrounded. The announcement in the invitation to the meeting stated: ''The same people who hate Father Coughlin hate Father Terminiello. They have persecuted him, hounded him, threatened him, but he has remained unaffected by their anti-Christian campaign against him.''

The jury had a right to believe that the defendant knew that the very presence of Gerald L. K. Smith with him at a meeting of this type would likely produce a mob gathering and mob resentment and violence, for he pointed out in his speech, referring to Gerald L. K. Smith, that he, the defendant, did not have the courage of Mr. Smith, who day after day, month after month, and year after year, went out and faced the same howling mob, and that in Cleveland it was first brought home to defendant the realization of the danger he faced. Knowing all this, and the likelihood of the effect that such a speech as the instant one would have upon an audience under such conditions, we do find that defendant's speech and conduct not only had a tendency to create a diversion tending to a breach of the peace but, in reality, there was created such a diversion and breach of the peace. No other reaction could reasonably be expected when we find this statement in his speech: ''We are in for a profound revolution. *Those of us who realize the inevitableness of the revolution, and are anxious that it be gradual and bloodless instead of somewhat bloody.*

*Of course, if necessary, we will have it more bloody";* and the further statement in his speech: ". . . and millions more through Eastern Europe at the close of the war are being murdered by these murderous Russians, hurt, being raped and sent into slavery. *That is what they want for you, that howling mob outside."* If these statements, coupled with the rest of his speech, are not an appeal to fury and an incitement to disorder and violence, then these words lose their English meaning. Even the defendant admitted upon cross-examination that the statement he made about the slimy scum that got in by mistake was an intemperate remark about the conditions that existed.

Is a speech like the one delivered by the defendant, and under the circumstances indicated, protected by the constitutional guarantee of freedom of speech? The Supreme Court of the United States has uniformly held that there are limits to the exercise of freedom of speech guaranteed by the Constitution.

In *Cantwell v. Connecticut*, 310 U. S. 296, where the constitutional guarantee of freedom of speech was invoked and sustained, the court had this to say at page 308:

"The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquillity. It includes not only violent acts *but acts and words likely to produce violence in others.* No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect." (Italics ours.)

On page 309, the court said:

"Cantwell's conduct, in the view of the court below, considered apart from the effect of his communication upon his hearers, did not amount to a breach of the

peace. One may, however, be guilty of the offense if he commit acts or make statements likely to provoke violence and disturbance of good order, *even though no such eventuality be intended.* Decisions to this effect are many, but examination discloses that, in practically all, *the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.''* (Italics ours.)

At page 310, the court said further:

''There are limits to the exercise of these liberties. The danger *in these times* from the coercive activities of those who in the delusion of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, is emphasized by events familiar to all. These and other transgressions of those limits the States appropriately may punish.'' (Italics ours.)

To the same effect, *Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc.,* 312 U. S. 287; *Chaplinsky v. New Hampshire,* 315 U. S. 568.

It is urged by defendant in argument that there was no intention on his part to stir up class prejudice, religious hatred and violent reaction in his listeners; that he did not limit himself to the Communistic or Zionistic Jew alone; and pointed to the statement made by him in his speech that he has the Christian attitude and wants his listeners to have the same attitude, and urges them to have no hatred and not to leave the meeting with hatred. If the jury, who saw and heard the defendant testify, concluded that he

was not sincere in those statements, that it was a familiar trick of speech, used by experienced and professional agitators for their own protection, then such statements cannot overcome the appeal to fury, emotion, and disorder, which the rest of the speech, as already pointed out, accomplished, and the jury could well reject the claim of good faith made for the defendant.

We are convinced that the defendant is shown by the evidence in this record to be a professional agitator, who, by his own testimony and the statement in the invitation to the meeting, admits he has been touring the country in this type of crusade. Defendant also admits that he has been suspended as a Catholic priest by his Bishop and stripped of his clerical prerogatives in the church. That he is a paid agitator is evidenced by the fact that a collection was made up in the instant meeting for the defendant.

The power of speech for good or evil has been recognized since the existence of civilization. Byron wrote:

"Religion—freedom—vengeance—what you will,
A word's enough to raise mankind to kill."

It is no longer open to dispute that under the Constitution one may speak or write freely upon any controversial question, concerning State policies, religion, politics, social, economics, or any other subject, and that this right, so paramount, must be protected. In all cases of doubt, the doubt should be resolved under the Constitution in favor of the right, provided, however, that one is not permitted, as shown by the authorities, to use the constitutional privilege as an instrument for abuse and incitement to violence, and go beyond the limits set in the *Cantwell* case.

As said in *National Labor Relations Board v. Pick Mfg. Co.*, 135 F. (2d) (7th Circuit) 329, at p. 331:

"The right of free speech is not absolute. It is a relative right. . . . As JUSTICE HOLMES once said the

right of free speech does not give one the right to yell 'fire' in a crowded theater. . . . Free speech does not mean license to speak without restraint.''

█ The demonstration on the outside of the meeting hall is one we must condemn as un-American and as clear a violation of law as can come to the observation of any court. Many of them were arrested, but the police should have done their full duty by dispersing the mob and suppressing the demonstration. However, this demonstration is no defense to the charge against this defendant.

The reasoning in *People v. Burman,* 154 Mich. 150, is directly in point. In that case the defendant was arrested for carrying a red flag through the streets of the City of Hancock, Michigan, in violation of an ordinance which read:

''That any person who shall make, aid, abet, countenance or assist in making any riot, noise, false alarm of fire, disturbance or improper diversion or commit any nuisance in any street or alley, or in or on any public or private property within the village to the annoyance or disturbance of citizens or travelers, shall, on conviction, be punished by a fine of not more than $20.00 or by imprisonment for a period not exceeding twenty days, or by both such fine and imprisonment, together with the costs of prosecution, in the discretion of the court.''

The defendant was convicted, and on appeal to the Supreme Court the judgment was affirmed. The court said (p. 156):

''The question here is not whether the defendants have in general a right to parade with a red flag. It is this: Had they such right, when they knew that *the natural and inevitable consequence was to create riot and disorder?* Defendants knew this red flag was hated by those to whom it was displayed, because it was believed to represent sentiments detestable to

every lover of our form of government. *They knew that it would excite fears and apprehension,* and that by displaying it they would provoke violence and disorder. *Their right to display a red flag was subordinate to the right of the public. They had no right to display it when the natural and inevitable consequence was to destroy the public peace and tranquillity.* It is idle to say that the public peace and tranquillity was disturbed by the noise and violence, not of defendants, but of those whose sentiments they offended. When defendants deliberately and knowingly offended that sentiment, they were responsible for the consequences which followed, and which they knew would follow. It is also idle to say that these others were wrongdoers in manifesting in the manner they did their resentment at defendants' conduct. This merely proves that they and defendants were joint wrongdoers; that they, as well as defendants, violated the ordinance in question.'' (Italics ours.)

■■ Complaint is made by the defendant that the trial court erred in refusing to admit certain exhibits offered by defendant, which were a number of pamphlets, booklets, reports, leaflets and publications of one type or another, sponsored by various organizations and individuals. We have examined them and find no relevancy to the charge upon which the defendant was tried. They had no material bearing upon the issue, and none of them could have been used, even for the purpose of impeachment of any of plaintiff's witnesses, since no proper foundation for such impeachment appears in the record to make them competent.

Complaint is made with respect to the instructions given and refused. We have examined them, and we do not find any merit in the complaint to justify setting aside the verdict and judgment.

The judgment of the Municipal Court is affirmed.

*Affirmed.*

O'CONNOR, J., concurs.
NIEMEYER, P. J., dissents.

NIEMEYER, P. J., dissents. The offense charged is a breach of the peace, or a diversion tending to a breach of the peace. As it is not defined by statute or ordinance we must look to the common law for its meaning. Breach of the peace is a generic term, including all violations of public peace or order, and acts tending to promote or excite others to breach of the peace. 8 Am. Jur., Breach of Peace, secs. 3 and 6; Words and Phrases, vol. 5, p. 763; *St. Louis v. Slupsky,* 254 Mo. 309; *State v. Steger,* 94 W. Va. 576. The acts must be public in character and such as actually tend to disturb the public peace and quiet. *People v. Monnier,* 280 N. Y. 77; *People v. Perry,* 265 N. Y. 362, 364–365; *People v. Reid,* 180 Misc. 289, 40 N. Y. S. (2d) 793; *People v. McWilliams,* 22 N. Y. S. (2d) 571. In the present case the speech of defendant must have been delivered in a public meeting or a public place to cause a breach of the peace. The courts have had no difficulty in determining what is a public meeting or place. In the case of *City of Bloomington v. Richardson,* 38 Ill. App. 60, 64, cited in the majority opinion, the court was considering a prosecution under an ordinance prohibiting a "public gathering or meeting" upon public streets or public grounds of the city without a permit. It there said, as quoted in the majority opinion and in accordance with the established weight of authority, "that a private meeting may be held on a public place and a public meeting on a private place." The court then gave an easily understood statement of the essentials of "public meetings" according to the common understanding. It said: "Whether a meeting is such (public) according to that understanding, we apprehend will depend primarily and essentially upon its intended composition, and generally, also, if not essentially, upon its object. It must be open to the general public, that is, to all who may have the opportunity and desire to attend it. To make the opportunity general, some notice of the time and place, intended and adapted to reach the public

generally, must be given.'' We found no case holding that a meeting attendance to which is restricted to invitation or selection is a public meeting, or a meeting rendering a place otherwise private a public place. In all cases where restricting of attendance to invitation has been considered, the meeting has been held not to be public and the place not a public place. In *Terry v. State,* 22 Tex. App. 679, the court, reversing a conviction of defendant, an invited guest at a wedding, for disturbing the peace by using loud, vociferous, vulgar and obscene language, cursing and swearing and displaying a knife, said, ''The fact that the private residence where the disturbance occurred was, at the time, a place where numerous persons had, upon invitation of the owner of the house, assembled on the occasion of a wedding, did not divest the residence of its private character, and deprive it of the protection afforded by the statute under which this conviction was obtained.'' Likewise, in *Austin v. State,* 124 S. W. 636 (Tex. Crim. App.), the court reversed a conviction for cursing and swearing at a public place. The evidence showed that persons were at a private home by invitation to a party. There was some evidence that persons closely related to the host attended and that no one going there was forbidden to enter. The court said: ''However, the issue was squarely raised that the persons present were there strictly by invitation, and that the house was not thrown open to the public generally. In this condition of the record we think the court should have given the special charge requested by counsel for the appellant, to the effect, in substance, that if they believed and found from the evidence that the place charged in the indictment was not a public place, but a private residence, and that those assembled at such place were there by invitation, then appellant would be entitled to an acquittal. This position seems well sustained by the recent case of *Pugh v. State,* 55 Tex. Cr. R. 462, 117 S. W. 817.'' In *State*

*v. Rosenfield,* 111 Minn. 301, in considering a statute prohibiting persons under 21 years to be and remain in a dance house, the court said: "It is true, as claimed by defendants' counsel in this connection, that the statute does not define a dance house; but in the absence of such a definition the term must be construed in accordance with its ordinary usage. So construing it, a dance house is a place maintained for promiscuous and public dancing, the rule of admission to which is not based upon personal selection or invitation." In *Mehlos v. Milwaukee,* 156 Wis. 591, 604, it was held proper to prescribe regulations for public dances as distinguished from dances on invitation. In *Finnem v. State,* 115 Ala. 106, cited by plaintiff, the court held that a field in the woods one-quarter to one-half mile from the public road, where 75 to 100 persons had assembled to witness a cock fight, was a public place. Among the facts making the field public was the fact that it was not necessary that people should have an invitation to be present, and that anyone who wished could be there. *Coleman v. State,* 20 Ala. 51, where the defendant was prosecuted for permitting card playing in his private room in violation of a statute prohibiting gambling in a public house and other public places, was cited. In that case the court said: "But we cannot hold that the assemblage of eight or ten persons at a private house or room, by invitation, and to which the public have not a right to go, for the purpose either of participating in the amusements going on, or partaking in the social enjoyments, will constitute such private house or room a public place, within the meaning of the act. If we were to hold this, we should be governed in our opinion by the number of persons alone, in determining whether the place was public, without regard to any other consideration. This, I think, would be improper; but we must look to the character of the place, the manner of ingress to it, as well as the number of persons that are, or do

assemble at it, in deciding whether it is public or private. Suppose an evening party given, at which a dozen or more were assembled by special invitation, but to which no one could go unless invited, without violating the rules of propriety, would this constitute the house a public place? We think not.''

Tested by these rules, the meeting at which defendant spoke was not a public meeting. There is no evidence that the auditorium had ever been used for meetings to which the public generally was admitted. There is no evidence that the sponsors of the meeting had ever held meetings open to the public generally. There is no evidence that any notice of the time and place intended and adapted to reaching the public generally was given. No admission fee was charged. Admission was by card only. These cards, admitting bearer and one friend, were sent with an invitation stating that a few extra cards were inclosed and requesting the invitee to ''make wise distribution of them.'' Two witnesses for defendant who were taking cards at the door testified that no one was admitted without a card, and there is no evidence to the contrary. These witnesses questioned some with cards who insisted on coming in, but do not say any of these were turned away. Many with cards were denied admission after the hall was filled. The meeting had all the characteristics of a private meeting and none of a public meeting, except that the subjects discussed were of public interest. The majority opinion holds that the meeting had the necessary characteristics of a public meeting. The tests adopted are not supported by precedent and no reasons are advanced to sustain them. They suggest pertinent queries necessarily answered in the negative and proving the fallacy of the position taken.

Is a meeting public or private as the attendance is large or small? Does a meeting intended to be private become public because the sponsors, underesti-

mating the drawing power of the speaker, send out more invitations than are necessary to fill the hall and some of the invitees are denied admission? Is a meeting of a business association or other organization restricted to members and invited guests public because non-member guests are selected by the individual members and not by the executive heads? Is a school dance public when the boys choose the girls they take, and does it become private only when the dance committee extends a personal invitation to each girl? Does the character of a meeting as public or private depend upon whether judges and jurors, with their different standards and prejudices, determine that the invitees were indiscriminately or discriminately selected?

There is no evidence that the cards were used indiscriminately either by those sending out the invitations or by invitees who distributed the extra tickets and brought their friends to the meeting. The propriety of the invitation to Latimer can be questioned only in the light of subsequent events. As the invitation to him was sent to his old address of a year before, he must have been on the mailing list for some time. There is no evidence that up to the time when he left the meeting and swore to the complaint he was unfriendly in thought or deed to the defendant, to Smith, who signed the invitation, to the organization sponsoring the meeting or to the purposes of the meeting. He was invited as a friend. The fact that he came as an enemy and a spy raises no inference against the good faith or judgment of the persons sending the invitation. So far as the evidence shows, only four persons—Latimer, Mrs. Lipman, Karel, and an unidentified man who called one of the speakers a liar—out of 800 to 1,000 present were hostile to the defendant or unsympathetic with his views. These persons may have used cards received by Latimer. There is no evidence or legitimate inference that in-

vitations or cards reached persons other than these four who were not "patriotic friends" of the meeting and those active in it. The presence of these unfriendly persons did not make the meeting public any more than the presence of employers' spies at a meeting of a labor union would make such meeting public and deprive the union members of the right to characterize strike breakers as scabs, etc.

If we accept the majority opinion holding that the meeting was public, it becomes necessary to determine when epithets, abusive and insulting language constitute a breach of the peace. It is universally held that such language does not constitute a breach of the peace unless it tends to incite immediate violence. *People v. Most,* 171 N. Y. 423, 427; *St. Louis v. Slupsky,* 254 Mo. 309, 318; *State v. Steger,* 94 W. Va. 576, 579. In *Ware v. Loveridge,* 75 Mich. 488, 492, the court said: "There are, in some of the definitions, references to language tending to provoke a breach of the peace, and relator's claim is based on this. But the authorities have very plainly held that this covers nothing that is not meant and adapted to bring about violence directly. It is laid down, very positively, that insulting and abusive language does not come within the rule, but it must be threats of immediate violence, or challenges to fight, or incitements to immediate personal violence or mischief." In Annotated Cases 1917 C (note p. 889) the author says: "But it seems that at common law language which was not threatening but merely abusive, vulgar or defamatory, did not constitute a breach of the peace, unless it was of a nature designed to bring about an altercation." In *Cantwell v. Connecticut,* 310 U. S. 296, 309, cited in the majority opinion, the court, in harmony with the foregoing rule, said: "One may, however, be guilty of the offense (common law breach of the peace) if he commit acts or make statements likely to provoke violence and disturbance of good order, even though no such even-

tuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, *the provocative-language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer.*" (Italics ours.) Statutes on the subject are restricted to punishing abusive and insulting language uttered in a public place and in the presence and hearing of the person to which the language applies. *Dyer v. State,* 99 Ga. 20; *Holmes v. State,* 135 Ark. 187; *State v. Hebert,* 121 Kan. 329. The reason underlying these statutes is stated in *Chaplinsky v. New Hampshire,* 315 U. S. 568. The court had under consideration a statute providing, "No person shall address any *offensive, derisive or annoying word to any other person who is lawfully in any street or other public place,* nor call him by any offensive or derisive name," etc. (Italics ours.) The court quoted from an opinion of the highest court of New Hampshire holding the act constitutional and saying that the purpose of the statute was to preserve the public peace, no words being "forbidden except such as have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed."

"The word 'offensive' is not to be defined in terms of what a particular addressee thinks. . . . The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight. . . . The statute, as construed, does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitutes a breach of the peace by the speaker including 'classical fighting words,' words in a current use less 'classical' but equally likely to cause violence, and other disorderly words, including profanity, obscenity and threats." The Supreme Court of the United States likewise held the act constitutional, saying: "It is a statute nar-

rowly drawn and limited to define and punish specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace.'' Consistently with the rule announced in these cases, the court in *Commonwealth v. Redshaw,* 12 Pa. Co. Ct. 91, draws a distinction between statements made to members of the speaker's group and those made publicly in the presence and hearing of the opposition. At a time of great public excitement arising out of labor troubles defendant called men on the public street "scabs,"—a fighting word in any labor controversy. The court said: "Where such a state of affairs exists it would not be disorderly conduct for the men of either party, among their own friends and in a reasonable manner, to express their opinions of the men belonging to the opposite party. But for a man of one party to intentionally apply an offensive epithet to a number of men of the other party as they were passing along the public highway, must of necessity tend to create a tumult and provoke a conflict.''

Defendant spoke when the building was surrounded by a belligerent, noisy mob, at least as large as the audience in the hall, seeking by mob violence and threats to deny to those in the hall the constitutional right of peaceable assembly and freedom of speech. His speech must be divided into two parts: the first, or extemporaneous part, in which epithets and abusive and insulting language were directed to the mob outside and such members of the mob as the defendant supposed had gotten into the hall by mistake; and the second, or main speech, which was anti-New Deal, anti-Communistic and anti-Jewish, at least as to some Jews —designated as criminal, atheistic, Communistic or Zionistic Jews, but not American Jews. Plaintiff introduced in evidence a transcript of the speech as taken by a court reporter of 17 years' experience in reporting trials, conventions and meetings. By agree-

ment of counsel the transcript as corrected was accepted as the speech made by defendant, and plaintiff's argument here is based on the transcript, which shows that in speaking of the mob defendant used the terms "scum" and "slimy scum." To these epithets Mrs. Lipman, wife of a director of the Chicago Civil Liberties Committee, of which Latimer is executive secretary, attempts to add, "skunks of Jews." As she admitted on direct and cross-examination that she had heard defendant make a later speech and had the two speeches confused, her testimony as to what the speaker said has no probative value.

The terms "scum," "slimy scum," and "skunks of Jews," are epithets, abusive and insulting terms. They are not in any proper sense communication of information or opinion safeguarded by the Constitution. *Cantwell v. Connecticut, supra,* pp. 309–310. When publicly made, as shown by the authorities heretofore cited, they constitute a breach of the peace only when addressed to and within the hearing of the person or persons to whom they are applied because they are words plainly likely to cause a breach of the peace by the addressee in resentment or retaliation. If none of the persons of whom the words were spoken was present and heard the words uttered, there is no breach of the peace. The burden of proving that members of the mob referred to as "scum," "slimy scum," and "skunks of Jews" were present and heard the words uttered concerning themselves, was upon plaintiff. The only possible basis for a claim that some of the mob gained admission is the statement of defendant in his speech that he supposed some had gotten into the hall by mistake, and a later reference to "scum" in the hall by mistake, based upon that supposition. No fact in evidence tends to support the claim that members of the mob got into the hall. The three witnesses for plaintiff deny any connection with the mob. It is not shown that the man who called one

of the speakers a liar had any connection with the mob, and it is uncertain whether he was present when defendant spoke. The only person of the Jewish race present was Karel, a witness for plaintiff. None of the words spoken applied to him and he did not take them as applying to himself. No one in the audience showed any resentment, indignation or inclination to fight or breach the peace because of these words. The only evidence as to the reaction of the audience to them is the testimony of Latimer. He testified on direct examination that when reference was made to the mob outside and defendant called them "scum," "slimy scum," "skunks," etc., the audience shouted and cried, "Tell them Father," or, "That is right." This reaction is not indicative of incitement to immediate violence, necessary to make spoken words a breach of the peace. The words were not uttered at a public meeting or in a public place, or in the presence or hearing of any person to whom they were applied. They did not, and under the circumstances of the time and place when and where they were uttered were not calculated to, excite immediate violence.

The remainder of the speech—a bitter denunciation of New Dealers, Communists and Jews, whom it linked together—is protected by the constitutional guarantees of communication of information and opinion. There was little if anything new in it. It did not cause or tend to cause a breach of the peace. The demonstrations of the audience, with the possible exception of the man who may have called defendant a liar, were in hearty approval of what defendant said. One witness for defendant says that the epithet "God damned liar" was uttered when defendant was speaking. Two witnesses for defendant say that it was applied when Smith was speaking. Karel, for plaintiff, heard it but does not state who was speaking at the time. Latimer said that a man was ejected from the hall when Smith or defendant was speaking—he did not recall which.

Had the episode occurred at a public meeting, the man calling the speaker a liar, and not the speaker, would have been guilty of breach of peace. No one in the hall was threatened, molested or attacked. Karel is the only witness who testifies to any bitter or violent expressions by the audience. He says that at various times persons in the audience hollered, yelled and shouted, "Dirty Kike!" "Kill the Jews!" "Send them back to Russia!"—and other expressions noted in the majority opinion. Latimer testified only to the expressions "Tell them Father," or "That is right," heretofore mentioned, and that when the speaker referred to the inoculation of Germans with disease germs, etc., "the people widely across the room said, 'Ah!' and 'Oh!' and other expressions of anger." Following the general rules of construction, the "other expressions of anger" heard by Latimer were similar to "Ah!" and "Oh!", which are exclamations of mild contempt, wonder, sorrow or shame, and not expressions of anger. Mrs. Lipman says that except "a little commotion when someone was taken out," and "except the clapping of hands, I heard no other noise inside the hall throughout the meeting." The experienced court reporter, who covered the meeting and who was expected to report all that happened and did note the breaking of glass on two occasions during defendant's speech, makes no reference to any of the interruptions and outcries of the audience testified to by Karel. It is significant that plaintiff did not call any of its three or four uniformed policemen and six plain clothes policemen, which it had stationed inside the hall, to corroborate Karel. Sherer, a director of Latimer's Chicago Civil Liberties Committee, who was present at the meeting, was not called. Jacques, a director and secretary of the American Civil Liberties Union (Chicago Division), who attended the meeting, was not called. Latimer admits that Jacques did not agree with him about the case.

Defendant called ten witnesses who were inside the hall, none of whom was more partisan than Karel, Latimer and Mrs. Lipman. Eight of these witnesses denied that the expressions testified to by Karel were uttered. The other two were not questioned on this point. Judged as a whole, the evidence overwhelmingly predominates in favor of the defendant and against plaintiff on the question of hostile or violent demonstrations by the audience.

As to his personal reaction Karel testified that he was aroused when defendant said that he was going to devote his life to clearing up the Pearl Harbor incident. He did not testify that he resented or was moved or aroused by any other parts of defendant's speech. His lack of reaction was similar to that of the two police officers in *People v. Downer*, 6 N. Y. S. (2d) 566, where as here the defendant was charged with breach of the peace or tending to cause a breach of the peace. The defendant Downer approached a police officer on a public street and asked the officer to recommend a restaurant not owned and not patronized by Jews, and said, ''I am starting a world revolution to kill all the Jews.'' He also handed to the arresting officer and to another patrolman a typewritten pamphlet headed ''World Revolution against the Jew President, the Jew Governor and the Jew Mayor.'' The court said:

''Both police officers are of the Jewish faith and the place where this occurred, namely, Coney Island, is largely populated by members of the Jewish race. The defendant told the officers that he had distributed about 5,000 copies of this pamphlet.

''There is no evidence in the case that there was an actual breach of the peace. The two officers who received the circulars were not disturbed or annoyed. However, it is contended by the People that the acts of the defendant tended to cause a breach of the peace. . . . These scurrilous attacks have been

published and broadcast in our own city for years without provoking any breach of the peace, and I do not believe that they are apt to do so at this time.

". . . That the circular in question is insulting, intemperate, and highly reprehensible is beyond question. Nevertheless, the acts and conduct of the defendant do not constitute a violation of Section 722 of the Penal Law, no more so than would be the public utterances during a political campaign by the orators of one party charging that the opposition party is dishonest and the enemy of the public, or any more so than the unjustified and indecent writings and oral declarations made from time to time against the adherents and disciples of other religious bodies."

The reaction of Latimer and Mrs. Lipman was against the lies that were told. Because of the lies Mrs. Lipman called up and offered to be a witness. Latimer said that he "swore out a warrant for people who tell lies." The truth of the statements made by defendant is not involved here. As said in *Cantwell v. Connecticut, supra,* p. 310, "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

There is nothing in the evidence to indicate that the defendant's attitude, bearing or manner of delivery of his speech was bellicose, belligerent, truculent, challenging or intimidating. His training had been that of a pulpit orator. In parts of his speech he impressed

upon his hearers the Christian duty to love the people of all races, limiting his condemnation to the criminal element in the races, and in closing he warned the audience to avoid any controversy with the mob outside and advised them not to stop and argue. Except for the fact that defendant spoke at a private meeting and in a private place, this case and *Cantwell v. Connecticut, supra,* are strikingly analogous. In that case Cantwell, a member of Jehovah's Witnesses, stopped two persons on a public street of the City of New Haven and, receiving permission to play a phonograph record, played the record ''Enemies,'' which attacked the religion and church of the two men, who were Catholics. Both were highly offended. One said he felt like hitting Cantwell, and the other that he was tempted to throw him off the street, and one told Cantwell he had better get off the street before something happened to him. Cantwell took up his phonograph and books and walked away. He was convicted of the common law offense of inciting a breach of peace. The conviction was reversed as an abridgment of the freedom of speech, the right to communicate information and opinion. In the present case as in the *Cantwell* case, the breach of the peace, if any, consisted in the effect of defendant's communication upon his hearers and not in any noisy, truculent, overbearing or offensive attitude or conduct of the defendant. There was no statute in Connecticut imposing a penalty for speeches inciting, counseling or promoting hatred, abuse, violence or hostility against any person or persons because of race, color or religion. The court drew a distinction between prosecutions based on the common law concept of breach of peace and prosecutions under a statute ''evincing a legislative judgment that street discussion of religious affairs, because of its tendency to provoke disorder, should be regulated,'' and concluded, saying: ''Although the contents of the record not unnaturally aroused ani-

mosity, we think that, in the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question.'' So in the absence of a statute in Illinois, the anti-New Deal, anti-Communist and anti-Jewish parts of defendant's speech, considered in the light of the constitutional guarantees, did not render him liable to conviction of the offense charged against him.

The judgment should be reversed.