## TERMINIELLO *v.* CHICAGO.

No. 272. Argued February 1, 1949.—Decided May 16, 1949.

*Albert W. Dilling* argued the cause and filed a brief for petitioner.

*L. Louis Karton* argued the cause for respondent. With him on the brief were *Benjamin S. Adamowski, Joseph F. Grossman, A. A. Pantelis* and *Harry A. Iseberg.*

*William E. Rodriguez* and *Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

*William Maslow, Shad Polier* and *Byron S. Miller* filed a brief for the American Jewish Congress, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner after jury trial was found guilty of disorderly conduct in violation of a city ordinance of Chicago [1] and fined. The case grew out of an address he delivered in an auditorium in Chicago under the auspices of the

---

[1] "All persons who shall make, aid, countenance, or assist in making any improper noise, riot, disturbance, breach of the peace, or diversion tending to a breach of the peace, within the limits of the city . . . shall be deemed guilty of disorderly conduct, and upon conviction thereof, shall be severally fined not less than one dollar nor more than two hundred dollars for each offense." Municipal Code of Chicago, 1939, § 193–1.

Christian Veterans of America. The meeting commanded considerable public attention. The auditorium was filled to capacity with over eight hundred persons present. Others were turned away. Outside of the auditorium a crowd of about one thousand persons gathered to protest against the meeting. A cordon of policemen was assigned to the meeting to maintain order; but they were not able to prevent several disturbances. The crowd outside was angry and turbulent.

Petitioner in his speech condemned the conduct of the crowd outside and vigorously, if not viciously, criticized various political and racial groups whose activities he denounced as inimical to the nation's welfare.

The trial court charged that "breach of the peace" consists of any "misbehavior which violates the public peace and decorum"; and that the "misbehavior may constitute a breach of the peace if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm." Petitioner did not take exception to that instruction. But he maintained at all times that the ordinance as applied to his conduct violated his right of free speech under the Federal Constitution. The judgment of conviction was affirmed by the Illinois Appellate Court (332 Ill. App. 17, 74 N. E. 2d 45) and by the Illinois Supreme Court. 396 Ill. 41, 71 N. E. 2d 2; 400 Ill. 23, 79 N. E. 2d 39. The case is here on a petition for certiorari which we granted because of the importance of the question presented.

The argument here has been focused on the issue of whether the content of petitioner's speech was composed of derisive, fighting words, which carried it outside the scope of the constitutional guarantees. See *Chaplinsky* v. *New Hampshire,* 315 U. S. 568; *Cantwell* v. *Connecticut,* 310 U. S. 296, 310. We do not reach that question, for there is a preliminary question that is dispositive of the case.

4

As we have noted, the statutory words "breach of the peace" were defined in instructions to the jury to include speech which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance . . . ." That construction of the ordinance is a ruling on a question of state law that is as binding on us as though the precise words had been written into the ordinance. See *Hebert* v. *Louisiana,* 272 U. S. 312, 317; *Winters* v. *New York,* 333 U. S. 507, 514.

The vitality of civil and political institutions in our society depends on free discussion. As Chief Justice Hughes wrote in *De Jonge* v. *Oregon,* 299 U. S. 353, 365, it is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes.

Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, *Chaplinsky* v. *New Hampshire, supra,* pp. 571–572, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. See *Bridges* v. *California,* 314 U. S. 252, 262; *Craig* v. *Harney,* 331 U. S. 367, 373. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas

either by legislatures, courts, or dominant political or community groups.

The ordinance as construed by the trial court seriously invaded this province. It permitted conviction of petitioner if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of those grounds may not stand.

The fact that petitioner took no exception to the instruction is immaterial. No exception to the instructions was taken in *Stromberg* v. *California*, 283 U. S. 359. But a judgment of conviction based on a general verdict under a state statute was set aside in that case, because one part of the statute was unconstitutional. The statute had been challenged as unconstitutional and the instruction was framed in its language. The Court held that the attack on the statute as a whole was equally an attack on each of its individual parts. Since the verdict was a general one and did not specify the ground upon which it rested, it could not be sustained. For one part of the statute was unconstitutional and it could not be determined that the defendant was not convicted under that part.

The principle of that case controls this one. As we have said, the gloss which Illinois placed on the ordinance gives it a meaning and application which are conclusive on us. We need not consider whether as construed it is defective in its entirety. As construed and applied it at least contains parts that are unconstitutional. The verdict was a general one; and we do not know on this record but what it may rest on the invalid clauses.

The statute as construed in the charge to the jury was passed on by the Illinois courts and sustained by them over the objection that as so read it violated the Fourteenth Amendment. The fact that the parties did not dispute its construction makes the adjudication no less

ripe for our review, as the *Stromberg* decision indicates.
We can only take the statute as the state courts read it.
From our point of view it is immaterial whether the state
law question as to its meaning was controverted or ac-
cepted. The pinch of the statute is in its application.
It is that question which the petitioner has brought here.
To say therefore that the question on this phase of the
case is whether the trial judge gave a wrong charge is
wholly to misconceive the issue.

But it is said that throughout the appellate proceedings
the Illinois courts assumed that the only conduct punish-
able and punished under the ordinance was conduct con-
stituting "fighting words." That emphasizes, however,
the importance of the rule of the *Stromberg* case. Peti-
tioner was not convicted under a statute so narrowly con-
strued. For all anyone knows he was convicted under the
parts of the ordinance (as construed) which, for example,
make it an offense merely to invite dispute or to bring
about a condition of unrest. We cannot avoid that issue
by saying that all Illinois did was to measure petitioner's
conduct, not the ordinance, against the Constitution. Pe-
titioner raised both points—that his speech was protected
by the Constitution; that the inclusion of his speech
within the ordinance was a violation of the Constitution.
We would, therefore, strain at technicalities to conclude
that the constitutionality of the ordinance as construed
and applied to petitioner was not before the Illinois
courts. The record makes clear that petitioner at all
times challenged the constitutionality of the ordinance as
construed and applied to him.

*Reversed.*

Mr. Chief Justice Vinson, dissenting.

I dissent. The Court today reverses the Supreme
Court of Illinois because it discovers in the record one
sentence in the trial court's instructions which permitted

the jury to convict on an unconstitutional basis. The offending sentence had heretofore gone completely undetected. It apparently was not even noticed, much less excepted to, by the petitioner's counsel at the trial. No objection was made to it in the two Illinois appellate tribunals which reviewed the case. Nor was it mentioned in the petition for certiorari or the briefs in this Court. In short, the offending sentence in the charge to the jury was no part of the case until this Court's independent research ferreted it out of a lengthy and somewhat confused record. I think it too plain for argument that a reversal on such a basis does not accord with any principle governing review of state court decisions heretofore announced by this Court. Certainly, *Stromberg* v. *California*, 283 U. S. 359 (1931), as MR. JUSTICE FRANKFURTER demonstrates, offers no precedent for today's action.

It will not do to say that, because the Illinois appellate courts affirmed the petitioner's conviction in the face of a constitutional attack, they necessarily must have approved the interpretation of the Chicago ordinance contained in the unnoticed instruction. The fact is that the Illinois courts construed the ordinance as punishing only the use of "fighting words." Their opinions plainly show that they affirmed because they thought that the petitioner's speech had been found by the jury to come within that category.[1] Their action was not, and cannot here be taken to be, an approval of the ordinance "as construed" by the instruction because the record clearly shows that the case was treated on appeal, both by counsel and by the courts, as if no such instruction existed. This Court can reverse the conviction because of the instruction only if we are to say that every time a state

---

[1] The opinions are reported at 332 Ill. App. 17, 74 N. E. 2d 45, and at 400 Ill. 23, 79 N. E. 2d 39. See, particularly, 332 Ill. App. at pp. 23 and 38; 400 Ill. at p. 33.

court affirms a conviction it necessarily must approve of every unnoticed and unobjected to error which we may discover in the record. If such is the doctrine of this case, I feel compelled to register my emphatic dissent.

The instruction informed the jury that they could return a verdict of guilty if they found that the petitioner's speech was one which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance." If the petitioner's counsel, who carefully made other constitutional objections throughout the proceedings below, had brought any issue here as to the constitutional validity of that instruction I would agree with the Court's decision. But the record gives me no basis on which to believe that the Illinois courts would not also have so decided if that issue had been presented to them.

The Court, as I understand it, does not reach the issue which the parties argued here—whether a properly instructed jury could constitutionally have found from the conflicting evidence in the record that, under the circumstances, the words in the petitioner's speech were "fighting words" to those inside the hall who heard them. Certainly, the Court does not decide whether the violent opposition of those outside the hall, who did not hear the speech, could constitutionally warrant the conviction of the petitioner in order to keep the streets from becoming ideological battlegrounds. Since neither of these constitutional issues is decided by the Court, I think that it is not within my province to indicate any opinion concerning them. See *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568 (1947).

Mr. Justice Frankfurter, dissenting.

For the first time in the course of the 130 years in which State prosecutions have come here for review, this Court is today reversing a sentence imposed by a State court

on a ground that was urged neither here nor below and that was explicitly disclaimed on behalf of the petitioner at the bar of this Court.

The impropriety of that part of the charge which is now made the basis of reversal was not raised at the trial nor before the Appellate Court of Illinois. The fact that counsel for Terminiello wholly ignored it is emphasized by the objections that he did make in relation to other instructions given and not given. On appeal to the Supreme Court of Illinois, counsel still failed to claim as error that which this Court on its own motion now finds violative of the Constitution. It was not mentioned by the Illinois Supreme Court in its careful opinion disposing of other claims and it was not included in the elaborate petition for rehearing in that court. Thus an objection, not raised by counsel in the Illinois courts, not made the basis of the petition for certiorari here—not included in the "Questions Presented," nor in the "Reasons Relied On for the Allowance of the Writ"—and explicitly disavowed at the bar of this Court, is used to upset a conviction which has been sustained by three courts of Illinois.

Reliance on *Stromberg* v. *California,* 283 U. S. 359, for what is done today is wholly misplaced. Neither expressly nor by implication has that decision any bearing upon the issue which the Court's opinion in this case raises, namely, whether it is open for this Court to reverse the highest court of a State on a point which was not brought before that court, did not enter into the judgment rendered by that court, and at no stage of the proceedings in this Court was invoked as error by the State court whose reversal is here sought. The *Stromberg* case presented precisely the opposite situation. In that case the claim which here prevailed was a ground of unconstitutionality urged before the California court; upon its rejection by that court it was made the basis of appeal

to this Court; it was here urged as the decisive ground for the reversal of the California judgment.

The *Stromberg* case dealt with a statute which proscribed conduct in a threefold way. The information upon which a verdict of guilty was secured was couched in the threefold terms of the statute, and in that form submitted to the jury. A general verdict followed. It was urged throughout the proceedings, and finally at the bar of this Court, that one of the proscriptions of the statute was invalid under the Fourteenth Amendment. That view was sustained. All that the case holds is that where the validity of a statute is successfully assailed as to one of three clauses of a statute and all three clauses were submitted to the jury, the general verdict has an infirmity because it cannot be assumed that the jury convicted on the valid portions of the statute and not on the invalid. There was no question in that case of searching the record for an alleged error that at no time was urged against the State judgment brought here for review.

In the *Stromberg* case an error that was properly urged was sustained. In this case a claim that was not urged but was disavowed is transmuted into a claim denied.

Only the uninformed will deride as a merely technical point objection to what the Court is doing in this case. The matter touches the very basis of this Court's authority in reviewing the judgments of State courts. We have no authority to meddle with such a judgment unless some claim under the Constitution or the laws of the United States has been made before the State court whose judgment we are reviewing and unless the claim has been denied by that court.[1] How could there have been a

---

[1] Our power of review in this case is limited not only to the question whether a right guaranteed by the Federal Constitution was denied, *Murdock* v. *City of Memphis*, 20 Wall. 590; *Haire* v. *Rice*,

denial of a federal claim by the Illinois courts, *i. e.*, that the trial judge offended the Constitution of the United States in what he told the jury, when no such claim was made? The relation of the United States and the courts of the United States to the States and the courts of the States is a very delicate matter. It is too delicate to permit silence when a judgment of a State court is reversed in disregard of the duty of this Court to leave untouched an adjudication of a State unless that adjudication is based upon a claim of a federal right which the State has had an opportunity to meet and to recognize. If such a federal claim was neither before the State court nor presented to this Court, this Court unwarrantably strays from its province in looking through the record to find some federal claim that might have been brought to the attention of the State court and, if so brought, fronted, and that might have been, but was not, urged here. This is a court of review, not a tribunal unbounded by rules. We do not sit like a kadi under a tree dispensing justice according to considerations of individual expediency.

Freedom of speech undoubtedly means freedom to express views that challenge deep-seated, sacred beliefs and to utter sentiments that may provoke resentment. But those indulging in such stuff as that to which this proceeding gave rise are hardly so deserving as to lead this Court to single them out as beneficiaries of the first

---

204 U. S. 291, 301; but to the particular claims duly made below, and denied. *Seaboard Air Line Ry.* v. *Duvall*, 225 U. S. 477, 485–488. We lack here the power occasionally exercised on review of judgments of lower federal courts to correct in criminal cases vital errors, although the objection was not taken in the trial court. *Wiborg* v. *United States*, 163 U. S. 632, 658–660; *Clyatt* v. *United States*, 197 U. S. 207, 221–222. This is a writ of error to a state court. Because we may not enquire into the errors now alleged, I concur in affirming the judgment of the state court." Concurring opinion of Mr. Justice Brandeis joined by Mr. Justice Holmes in *Whitney* v. *California*, 274 U. S. 357, 380.

departure from the restrictions that bind this Court in reviewing judgments of State courts. Especially odd is it to bestow such favor not for the sake of life or liberty, but to save a small amount of property—$100, the amount of the fine imposed upon the petitioner in a proceeding which is civil, not criminal, under the laws of Illinois, and thus subject only to limited review. *City of Chicago* v. *Terminiello*, 400 Ill. 23, 29, 79 N. E. 2d. 39, 43. This Court has recognized that fines of this nature are not within provisions of the Constitution governing federal criminal prosecutions. See *Hepner* v. *United States*, 213 U. S. 103.

The importance of freedom of speech of course cannot be measured by dollars and cents. A great principle may be at stake, as in the *Case of the Ship Money*, though the issue arise over the payment of a few shillings' tax. Were the Court to sustain the claim urged throughout these proceedings, in Illinois and here, namely, that a law is unconstitutional when it forbids Terminiello's harangue in the circumstances of its utterance, it would be immaterial that only $100 is involved. But to inject an error into the record in order to avoid the issue on which the case was brought here—for certainly relief from the payment of a fine of $100 could not alone have induced this Court to excogitate a defect in the judgment which counsel thoughtfully rejected and which three State courts did not consider—hardly raises the objection to the dignity of such a principle. If the Court refrained from taking phrases out of their environment and finding in them a self-generated, objection, it could not be deemed to have approved of them even as abstract propositions.

On the merits of the issue reached by the Court, I share Mr. Justice Jackson's views. For I assume that the Court does not mean to reject, except merely for purposes of this case, the basic principle that guides scrutiny of

a charge on appeal. I assume, that is, that a charge is not to be deemed a bit of abstraction in a non-existing world; the function which a charge serves is to give practical guidance to a jury in passing on the case that was unfolded before it—the particular circumstances in their particular setting.

MR. JUSTICE JACKSON and MR. JUSTICE BURTON join this dissent.

MR. JUSTICE JACKSON, dissenting.

The Court reverses this conviction by reiterating generalized approbations of freedom of speech with which, in the abstract, no one will disagree. Doubts as to their applicability are lulled by avoidance of more than passing reference to the circumstances of Terminiello's speech and judging it as if he had spoken to persons as dispassionate as empty benches, or like a modern Demosthenes practicing his Philippics on a lonely seashore.

But the local court that tried Terminiello was not indulging in theory. It was dealing with a riot and with a speech that provoked a hostile mob and incited a friendly one, and threatened violence between the two. When the trial judge instructed the jury that it might find Terminiello guilty of inducing a breach of the peace if his behavior stirred the public to anger, invited dispute, brought about unrest, created a disturbance or molested peace and quiet by arousing alarm, he was not speaking of these as harmless or abstract conditions. He was addressing his words to the concrete behavior and specific consequences disclosed by the evidence. He was saying to the jury, in effect, that if this particular speech added fuel to the situation already so inflamed as to threaten to get beyond police control, it could be punished as inducing a breach of peace. When the light of the evidence not recited by the Court is thrown upon the Court's opinion, it discloses that underneath a little issue of

Terminiello and his hundred-dollar fine lurk some of the most far-reaching constitutional questions that can confront a people who value both liberty and order. This Court seems to regard these as enemies of each other and to be of the view that we must forego order to achieve liberty. So it fixes its eyes on a conception of freedom of speech so rigid as to tolerate no concession to society's need for public order.

An old proverb warns us to take heed lest we "walk into a well from looking at the stars." To show why I think the Court is in some danger of doing just that, I must bring these deliberations down to earth by a long recital of facts.

Terminiello, advertised as a Catholic Priest, but revealed at the trial to be under suspension by his Bishop, was brought to Chicago from Birmingham, Alabama, to address a gathering that assembled in response to a call signed by Gerald L. K. Smith, which, among other things, said:

> ". . . The same people who hate Father Coughlin hate Father Terminiello. They have persecuted him, hounded him, threatened him, but he has remained unaffected by their anti-Christian campaign against him. You will hear all sorts of reports concerning Father Terminiello. But remember that he is a Priest in good standing and a fearless lover of Christ and America."

The jury may have considered that this call attempted to capitalize the hatreds this man had stirred and foreshadowed, if it did not intend to invite, the kind of demonstration that followed.

Terminiello's own testimony shows the conditions under which he spoke. So far as material it follows:

> ". . . We got there [the meeting place] approximately fifteen or twenty minutes past eight. The car stopped at the front entrance. There was a

crowd of three or four hundred congregated there shouting and cursing and picketing. . . .

"When we got there the pickets were not marching; they were body to body and covered the sidewalk completely, some on the steps so that we had to form a flying wedge to get through. Police escorted us to the building, and I noticed four or five others there.

"They called us 'God damned Fascists, Nazis, ought to hang the so and sos.' When I entered the building I heard the howls of the people outside. . . . There were four or five plain clothes officers standing at the entrance to the stage and three or four at the entrance to the back door.

"The officers threatened that if they broke the door again they would arrest them and every time they opened the door a little to look out something was thrown at the officers, including ice-picks and rocks.

"A number of times the door was broken, was partly broken through. There were doors open this way and they partly opened and the officers looked out two or three times and each time ice-picks, stones and bottles were thrown at the police at the door. I took my place on the stage, before this I was about ten or fifteen minutes in the body of the hall.

"I saw a number of windows broken by stones or missiles. I saw the back door being forced open, pushed open.

"The front door was broken partly open after the doors were closed. There were about seven people seated on the stage. Smith opened the meeting with prayer, the Pledge of Allegiance to the Flag and singing of America. There were other speakers who spoke before me and before I spoke I heard things happening in the hall and coming from the outside.

"I saw rocks being thrown through windows and that continued throughout at least the first half of the meeting, probably longer, and again attempts were made to force the front door, rather the front door was forced partly. The howling continued on the outside, cursing could be heard audibly in the hall at times. Police were rushing in and out of the front door protecting the front door, and there was a general commotion, all kinds of noises and violence—all from the outside. .

"Between the time the first speaker spoke and I spoke, stones and bricks were thrown in all the time. I started to speak about 35 or 40 minutes after the meeting started, a little later than nine o'clock. . . ."

The court below, in addition to this recital, heard other evidence, that the crowd reached an estimated number of 1,500. . Picket lines obstructed and interfered with access to the building. The crowd constituted "a surging, howling mob hurling epithets" at those who would enter and "tried to tear their clothes off." One young woman's coat was torn off and she had to be assisted into the meeting by policemen. Those inside the hall could hear the loud noises and hear those on the outside yell, "Fascists," "Hitlers" and curse words like "damn Fascists." Bricks were thrown through the windowpanes before and during the speaking. About 28 windows were broken. The street was black with people on both sides for at least a block either way; bottles, stink bombs and brickbats were thrown. Police were unable to control the mob, which kept breaking the windows at the meeting hall, drowning out the speaker's voice at times and breaking in through the back door of the auditorium. About 17 of the group outside were arrested by the police.

Knowing of this environment, Terminiello made a long speech, from the stenographic record of which I omit

relatively innocuous passages and add emphasis to what seems especially provocative:

"Father Terminiello: Now, I am going to whisper my greetings to you, Fellow Christians. I will interpret it. I said, 'Fellow *Christians*,' and I suppose there are *some of the scum got in by mistake,* so I want to tell a story about *the scum:*

". . . And nothing I could say tonight could begin to express the contempt I have for the *slimy scum* that got in by mistake.

". . . The subject I want to talk to you tonight about is the attempt *that is going on right outside this hall tonight,* the attempt that is going on to *destroy America by revolution. . . .*

"My friends, it is no longer true that it can't happen here. It is happening here, and it only depends upon you, good people, who are here tonight, depends upon all of us together, as Mr. Smith said. The tide is changing, and if you and I turn and run from that tide, we will all be drowned in this tidal wave of Communism which is going over the world.

". . . I am not going to talk to you about the menace of Communism, which is already accomplished, in Russia, where from eight to fifteen million people were murdered in cold blood by their own countrymen, and millions more through Eastern Europe at the close of the war are being murdered by these murderous Russians, hurt, being raped and sent into slavery. *That is what they want for you, that howling mob outside.*

"I know I was told one time that my winter quarters were ready for me in Siberia. I was told that. Now, I am talking about the fifty-seven varieties that we have in America, and we have fifty-seven varieties of pinks and reds and pastel shades in this country; and all of it can be traced back to the

twelve years we spent under the New Deal, because that was the build-up for what is going on in the world today.

"Now, Russia promised us we would ga [*sic*] back to the official newspaper of Russia. Primarily, it was back about 1929. They quoted the words of George E. Dimitroff, who at that time was the Executive Secretary of the Communist International. I only quote you this one passage. I could quote thousands of paragraphs for you. Let me quote you: 'The worldwide nature of our program is not mere talk, but an all embracing *blood-soaked reality.' That is what they want for us, a blood-soaked reality but it was promised to us by the crystal gazers in Washington;* and you know what I mean by the 'crystal gazers', I presume.

"First of all, we had Queen Eleanor. Mr. Smith said, 'Queen Eleanor is now one of the world's communists.' She is one who said this—imagine, coming from the spouse of the former President of the United States for twelve long years—this is what she said: 'The war is but a step in the revolution. The war is but one step in the revolution, and we know who started the war.'

"Then we have Henry Adolph Wallace, the sixty million job magician. You know we only need fifty-four million jobs in America and everybody would be working. He wants sixty million jobs, because some of the bureaucrats want two jobs apiece. Here he is, what he says about revolution: 'We are in for a profound revolution. Those of us who realize the inevitableness of the revolution, and are anxious that it be *gradual and bloodless* instead of *somewhat bloody. Of course, if necessary, we will have it more bloody.'*

"And then Chief Justice Stone had this to say: 'A way has been found for the effective suppression of speeches and press and religion, despite constitutional guarantee,'—from the Chief Justice, from the Chief Justice of the United States.

"Now, my friends, they are planning another ruse; and if it ever happens to this cou-try [*sic*], God help America. They are going to try to put into Mr. Edgar Hoover's position a man by the name of *George Swarzwald.* I think even those who were uneducated on so-called sedition charges, that the majority of the individuals in this department, that Christ-like men and women who realize today what is going on in this country, men who are in this audience today, who want *to know the names of those people, before they are outside, they want to know the names if any. Did you hear any tonight that you recognize? Most of them probably are imported. They are imported from Russia, certainly. If you know the names, please send them to me immediately. . . .*

". . . Didn't you ever read the Morgenthau plan for the starvation of little babies and pregnant women in Germany? Whatever could a child that is born have to do with Hitler or anyone else at the beginning of the war? Why should every child in Germany today not live to be more than two or three months of age? Because Morgenthau wants it that way, and so did F. D. R. . . . *You will know who is behind it when I tell you the story* of a doctor in Akron, Ohio. He boasted to a friend of mine within the last few days, while he was in the service of this country as a doctor, he and others of his kind made it a practice—now, this was not only one man—made it a practice to amputate the limbs of every German they came in contact with—when-

ever they could get away with it; so, that they could never carry a gun. Imagine men of that caliber, sworn to serve this beautiful country of ours, *why should we tolerate them?*

"My friends, this moment someone reminded me of the plan to sterilize them. The nurses, they tell me are going to inject diseases in them, syphilis and other diseases in *every one that came there all of one race, all non-Chi 'stians. . . .*

"Now, we are going to get the threats of the people of Argentine, the people of Spain. We have now declared, according to our officials, to have declared Franco to have taken the place of Hitler. *Franco was the savior of what was left of Europe.*

"Now, let me say, I am going to talk about—I almost said, about the Jews. Of course, I would not want to say that. However, I am going to talk about some Jews. I hope that—I am a Christian minister. We must take a Christian attitude. I don't want you to go from this hall with hatred in your heart for any person, for no person. . . .

"Now, this danger which we face—let us call them Zionist Jews if you will, let's call them atheistic, communistic Jewish or Zionist Jews, then let us not fear to condemn them. You remember the Apostles when they went into the upper room after the death of the Master, they went in there, after locking the doors; they closed the windows. (At this time there was a very loud noise as if something was being thrown into the building.)

"Don't be disturbed. That happened, by the way, while Mr. Gerald Smith was saying 'Our Father who art in heaven;' (just then a rock went through the window.) *Do you wonder they were persecuted in other countries in the world? . . .*

*"You know I have always made a study of the psychology, sociology of mob reaction. It is exemplified out there.* Remember there has to be a leader to that mob. He is not out there. He is probably across the street, looking out the window. There must be certain things, money, other things, in order to have successful mob action; there must be rhythm. There must be some to beat a cadence. Those mobs are chanting; that is the caveman's chant. They were trained to do it. They were trained this afternoon. They are being led; *there will be violence.*

"That is why I say to you, men, don't you do it. Walk out of here dignified. The police will protect you. Put the women on the inside, where there will be no hurt to them. Just walk; don't stop and argue. . . . They want to picket our meetings. They don't want us to picket their meetings. It is the same kind of tolerance, if we said there was a bedbug in bed, 'We don't care for you,' or if we looked under the bed and found a snake and said, 'I am going to be tolerant and leave the snake there.' We will not be tolerant of that mob out there. We are not going to be tolerant any longer.

"We are strong enough. We are not going to be tolerant of their smears any longer. We are going to *stand up and dare them to smear us.* . . .

"So, my friends, since we spent much time tonight trying to quiet the howling mob, I am going to bring my thoughts to a conclusion, and the conclusion is this. We must all be like the Apostles before the coming of the Holy Ghost. We must not lock ourselves in an upper room for fear of the Jews. I speak of the Communistic Zionistic Jew, and those are not American Jews. We don't want them here; we want them to go back where they came from.

"Mr. Smith: I would like to ask that Miss Purcell would please go back to the front of the building and contact the police officer in charge of the detail. We are going to adjourn this meeting if and when Miss Purcell comes back and reports to me that the one in charge of the detail believes it is safe for us to go out on the street. I am sure it is. Sit still. We are not going to have anybody move. If there are any chiselers that want to go, we are going to take up an offering for Father Terminiello.

"(There was further discussion to stimulate this offering which was not reported.)"

Such was the speech. Evidence showed that it stirred the audience not only to cheer and applaud but to expressions of immediate anger, unrest and alarm. One called the speaker a "God damned liar" and was taken out by the police. Another said that "Jews, niggers and Catholics would have to be gotten rid of." One response was, "Yes, the Jews are all killers, murderers. If we don't kill them first, they will kill us." The anti-Jewish stories elicited exclamations of "Oh!" and "Isn't that terrible!" and shouts of "Yes, send the Jews back to Russia," "Kill the Jews," "Dirty kikes," and much more of ugly tenor. This is the specific and concrete kind of anger, unrest and alarm, coupled with that of the mob outside, that the trial court charged the jury might find to be a breach of peace induced by Terminiello. It is difficult to believe that this Court is speaking of the same occasion, but it is the only one involved in this litigation.

Terminiello, of course, disclaims being a fascist. Doubtless many of the indoor audience were not consciously such. His speech, however, followed, with fidelity that is more than coincidental, the pattern of European fascist leaders.

The street mob, on the other hand, included some who deny being communists, but Terminiello testified and offered to prove that the demonstration was communist-organized and communist-led. He offered literature of left-wing organizations calling members to meet and "mobilize" for instruction as pickets and exhorting followers: "All out to fight Fascist Smith."

As this case declares a nation-wide rule that disables local and state authorities from punishing conduct which produces conflicts of this kind, it is unrealistic not to take account of the nature, methods and objectives of the forces involved. This was not an isolated, spontaneous and unintended collision of political, racial or ideological adversaries. It was a local manifestation of a world-wide and standing conflict between two organized groups of revolutionary fanatics, each of which has imported to this country the strong-arm technique developed in the struggle by which their kind has devastated Europe. Increasingly, American cities have to cope with it. One faction organizes a mass meeting, the other organizes pickets to harass it; each organizes squads to counteract the other's pickets; parade is met with counterparade. Each of these mass demonstrations has the potentiality, and more than a few the purpose, of disorder and violence. This technique appeals not to reason but to fears and mob spirit; each is a show of force designed to bully adversaries and to overawe the indifferent. We need not resort to speculation as to the purposes for which these tactics are calculated nor as to their consequences. Recent European history demonstrates both.

Hitler summed up the strategy of the mass demonstration as used by both fascism and communism: "We should not work in secret conventicles, but in mighty mass demonstrations, and it is not by dagger and poison or pistol that the road can be cleared for the movement but *by the conquest of the streets*. We must teach the Marxists

that the future *master of the streets* is National Socialism, just as it will some day be the master of the state." (Emphasis supplied.) 1 *Nazi Conspiracy and Aggression* (GPO, 1946) 204, 2 *id.* 140, Docs. 2760–PS, 404-PS, from *"Mein Kampf."* First laughed at as an extravagant figure of speech, the battle for the streets became a tragic reality when an organized *Sturmabteilung* began to give practical effect to its slogan that "possession of the streets is the key to power in the state." *Ibid.,* also Doc. 2168–PS.

The present obstacle to mastery of the streets by either radical or reactionary mob movements is not the opposing minority. It is the authority of local governments which represent the free choice of democratic and law-abiding elements of all shades of opinion, but who, whatever their differences, submit them to free elections which register the results of their free discussion. The fascist and communist groups, on the contrary, resort to these terror tactics to confuse, bully and discredit those freely chosen governments. Violent and noisy shows of strength discourage participation of moderates in discussions so fraught with violence, and real discussion dries up and disappears. And people lose faith in the democratic process when they see public authority flouted and impotent and begin to think the time has come when they must choose sides in a false and terrible dilemma such as was posed as being at hand by the call for the Terminiello meeting: "Christian Nationalism or World Communism— Which?"

This drive by totalitarian groups to undermine the prestige and effectiveness of local democratic governments is advanced whenever either of them can win from this Court a ruling which paralyzes the power of these officials. This is such a case. The group of which Terminiello is a part claims that his behavior, because it involved a speech, is above the reach of local authorities.

If the mild action those authorities have taken is forbidden, it is plain that hereafter there is nothing effective left that they can do. If they can do nothing as to him, they are equally powerless as to rival totalitarian groups. Terminiello's victory today certainly fulfills the most extravagant hopes of both right and left totalitarian groups, who want nothing so much as to paralyze and discredit the only democratic authority that can curb them in their battle for the streets.

I am unable to see that the local authorities have transgressed the Federal Constitution. Illinois imposed no prior censorship or suppression upon Terminiello. On the contrary, its sufferance and protection was all that enabled him to speak. It does not appear that the motive in punishing him is to silence the ideology he expressed as offensive to the State's policy or as untrue, or has any purpose of controlling his thought or its peaceful communication to others. There is no claim that the proceedings against Terminiello are designed to discriminate against him or the faction he represents or the ideas that he bespeaks. There is no indication that the charge against him is a mere pretext to give the semblance of legality to a covert effort to silence him or to prevent his followers or the public from hearing any truth that is in him.

A trial court and jury has found only that in the context of violence and disorder in which it was made, this speech was a provocation to immediate breach of the peace and therefore cannot claim constitutional immunity from punishment. Under the Constitution as it has been understood and applied, at least until most recently, the State was within its powers in taking this action.

Rioting is a substantive evil, which I take it no one will deny that the State and the City have the right and the duty to prevent and punish. Where an offense is

induced by speech, the Court has laid down and often reiterated a test of the power of the authorities to deal with the speaking as also an offense. "The question in every case is whether the words *used are used in such circumstances* and are of *such a nature* as to create a *clear and present danger* that they will bring about the substantive evils that Congress [or the State or City] has a right to prevent." (Emphasis supplied.) Mr. Justice Holmes in *Schenck* v. *United States*, 249 U. S. 47, 52. No one ventures to contend that the State on the basis of this test, for whatever it may be worth, was not justified in punishing Terminiello. In this case the evidence proves beyond dispute that danger of rioting and violence in response to the speech was clear, present and immediate. If this Court has not silently abandoned this long-standing test and substituted for the purposes of this case an unexpressed but more stringent test, the action of the State would have to be sustained.

Only recently this Court held that a state could punish as a breach of the peace use of epithets such as "damned racketeer" and "damned fascist," addressed to only one person, an official, because likely to provoke the average person to retaliation. But these are mild in comparison to the epithets "slimy scum," "snakes," "bedbugs," and the like, which Terminiello hurled at an already inflamed mob of his adversaries. MR. JUSTICE MURPHY, writing for a unanimous Court in *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572, said:

> "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed

that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or per-sonal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell* v. *Connecticut*, 310 U. S. 296, 309–310."

In the latter case Mr. Justice Roberts for a unanimous Court also said:

"The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." 310 U. S. 296, 308.

How this present decision, denying state power to punish civilly one who precipitated a public riot involving hundreds of fanatic fighters in a most violent melee, can be squared with those unanimous statements of law, is incomprehensible to me. And the Court recently cited these two statements as indicating that "The essential rights of the First Amendment in some instances are subject to the elemental need for order without which the guarantees of civil rights to others would be a mock-

ery." *United Public Workers* v. *Mitchell,* 330 U. S. 75, 95.

However, these wholesome principles are abandoned today and in their place is substituted a dogma of absolute freedom for irresponsible and provocative utterance which almost completely sterilizes the power of local authorities to keep the peace as against this kind of tactics.

Before giving the First and Fourteenth Amendments to the Constitution this effect, we should recall that our application of the First Amendment to Illinois rests entirely on authority which this Court has voted to itself. The relevant parts of the First Amendment, with emphasis supplied, reads: "*Congress* shall make *no* law . . . abridging the freedom of speech." This restrains no authority except Congress. Read as literally as some would do, it restrains Congress in terms so absolute that no legislation would be valid if it touched free speech, no matter how obscene, treasonable, defamatory, inciting or provoking. If it seems strange that no express qualifications were inserted in the Amendment, the answer may be that limitations were thought to be implicit in the definition of "freedom of speech" as then understood. Or it may have been thought unnecessary to delegate to *Congress* any power over abuses of free speech. The Federal Government was then a new and experimental authority, remote from the people, and it was supposed to deal with a limited class of national problems. Inasmuch as any breaches of peace from abuse of free speech traditionally were punishable by state governments, it was needless to reserve that power in a provision drafted to exclude only Congress from such a field of law-making.

The Fourteenth Amendment forbade states to deny the citizen "due process of law." But its terms gave no notice to the people that its adoption would strip their local governments of power to deal with such problems of local

peace and order as we have here. Nor was it hinted by this Court for over half a century that the Amendment might have any such effect. In 1922, with concurrence of the most liberty-alert Justices of all times—Holmes and Brandeis—this Court declared flatly that the Constitution does not limit the power of the state over free speech. *Prudential Insurance Co.* v. *Cheek,* 259 U. S. 530, 543. In later years the Court shifted its dogma and decreed that the Constitution does this very thing and that state power is bound by the same limitation as Congress. *Gitlow* v. *New York,* 268 U. S. 652. I have no quarrel with this history. See *Board of Education* v. *Barnette,* 319 U. S. 624. I recite the method by which the right to limit the state has been derived only from this Court's own assumption of the power, with never a submission of legislation or amendment into which the people could write any qualification to prevent abuse of this liberty, as bearing upon the restraint I consider as becoming in exercise of self-given and unappealable power.

It is significant that provisions adopted by the people with awareness that they applied to their own states have universally contained qualifying terms. The Constitution of Illinois is representative of the provisions put in nearly all state constitutions and reads (Art. II, § 4): "Every person may freely speak, write and publish on all subjects, *being responsible for the abuse of that liberty.*" (Emphasis added.) That is what I think is meant by the cryptic phrase "freedom of speech," as used in the Federal Compact, and that is the rule I think we should apply to the states.

This absence from the Constitution of any expressed power to deal with abuse of freedom of speech has enabled the Court to soar aloof from any consideration of the abuses which create problems for the states and to indulge in denials of local authority, some of which seem to me improvident in the light of functions which local gov-

ernments must be relied on to perform for our free society. Quite apart from any other merits or defects, recent decisions have almost completely immunized this battle for the streets from any form of control.

Streets and parks maintained by the public cannot legally be denied to groups "for communication of ideas." *Hague* v. *C. I. O.,* 307 U. S. 496; *Jamison* v. *Texas,* 318 U. S. 413. Cities may not protect their streets from activities which the law has always regarded subject to control, as nuisances. *Lovell* v. *Griffin,* 303 U. S. 444; *Schneider* v. *State,* 308 U. S. 147. Cities may not protect the streets or even homes of their inhabitants from the aggressions of organized bands operating in large numbers. *Douglas* v. *Jeannette,* 319 U. S. 157. As in this case, the facts are set forth fully only in the dissent, p. 166. See also *Martin* v. *Struthers,* 319 U. S. 141. Neither a private party nor a public authority can invoke otherwise valid state laws against trespass to exclude from their property groups bent on disseminating propaganda. *Marsh* v. *Alabama,* 326 U. S. 501; *Tucker* v. *Texas,* 326 U. S. 517. Picketing is largely immunized from control on the ground that it is free speech, *Thornhill* v. *Alabama,* 310 U. S. 88, and police may not regulate sound trucks and loud-speakers, *Saia* v. *New York,* 334 U. S. 558, though the Court finds them an evil that may be prohibited altogether. *Kovacs* v. *Cooper,* 336 U. S. 77. And one-third of the Court has gone further and declared that a position "that the state may prevent any conduct which induces people to violate the law, or any advocacy of unlawful activity, cannot be squared with the First Amendment . . ." and it is only we who can decide when the limit is passed. *Musser* v. *Utah,* 333 U. S. 95, 102. Whatever the merits of any one of these decisions in isolation, and there were sound reasons for some of them, it cannot be denied that their cumulative effect has been a sharp handicap on municipal control

of the streets and a dramatic encouragement of those who would use them in a battle of ideologies.

I do not think we should carry this handicap further, as we do today, but should adhere to the principles heretofore announced to safeguard our liberties against abuse as well as against invasion. It should not be necessary to recall these elementary principles, but it has been a long time since some of them were even mentioned in this Court's writing on the subject and results indicate they may have been overlooked.

I begin with the oft-forgotten principle which this case demonstrates, that freedom of speech exists only under law and not independently of it. What would Terminiello's theoretical freedom of speech have amounted to had he not been given active aid by the officers of the law? He could reach the hall only with their help, could talk only because they restrained the mob, and could make his getaway only under their protection. We would do well to recall the words of Chief Justice Hughes in *Cox* v. *New Hampshire,* 312 U. S. 569, 574: "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. . . ."

This case demonstrates also that this Court's service to free speech is essentially negative and can consist only of reviewing actions by local magistrates. But if free speech is to be a practical reality, affirmative and immediate protection is required; and it can come only from nonjudicial sources. It depends on local police, maintained by law-abiding taxpayers, and who, regardless of their own feelings, risk themselves to maintain supremacy of law. Terminiello's theoretical right to speak free from interference would have no reality if Chicago should withdraw its officers to some other section of the city, or if the men assigned to the task should look the other

way when the crowd threatens Terminiello. Can society be expected to keep these men at Terminiello's service if it has nothing to say of his behavior which may force them into dangerous action?

No one will disagree that the fundamental, permanent and overriding policy of police and courts should be to permit and encourage utmost freedom of utterance. It is the legal right of any American citizen to advocate peaceful adoption of fascism or communism, socialism or capitalism. He may go far in expressing sentiments whether pro-Semitic or anti-Semitic, pro-Negro or anti-Negro, pro-Catholic or anti-Catholic. He is legally free to argue for some anti-American system of government to supersede by constitutional methods the one we have. It is our philosophy that the course of government should be controlled by a consensus of the governed. This process of reaching intelligent popular decisions requires free discussion. Hence we should tolerate no law or custom of censorship or suppression.

But we must bear in mind also that no serious outbreak of mob violence, race rioting, lynching or public disorder is likely to get going without help of some speech-making to some mass of people. A street may be filled with men and women and the crowd still not be a mob. Unity of purpose, passion and hatred, which merges the many minds of a crowd into the mindlessness of a mob, almost invariably is supplied by speeches. It is naive, or worse, to teach that oratory with this object or effect is a service to liberty. No mob has ever protected any liberty, even its own, but if not put down it always winds up in an orgy of lawlessness which respects no liberties.

In considering abuse of freedom by provocative utterances it is necessary to observe that the law is more tolerant of discussion than are most individuals or communities. Law is so indifferent to subjects of talk that I think of none that it should close to discussion. Reli-

gious, social and political topics that in other times or countries have not been open to lawful debate may be freely discussed here.

Because a subject is legally arguable, however, does not mean that public sentiment will be patient of its advocacy at all times and in all manners. So it happens that, while peaceful advocacy of communism or fascism is tolerated by the law, both of these doctrines arouse passionate reactions. A great number of people do not agree that introduction to America of communism or fascism is even debatable. Hence many speeches, such as that of Terminiello, may be legally permissible but may nevertheless in some surroundings be a menace to peace and order. When conditions show the speaker that this is the case, as it did here, there certainly comes a point beyond which he cannot indulge in provocations to violence without being answerable to society.

Determination of such an issue involves a heavy responsibility. Courts must beware lest they become mere organs of popular intolerance. Not every show of opposition can justify treating a speech as a breach of peace. Neither speakers nor courts are obliged always and in all circumstances to yield to prevailing opinion and feeling. As a people grow in capacity for civilization and liberty their tolerance will grow, and they will endure, if not welcome, discussion even on topics as to which they are committed. They regard convictions as tentative and know that time and events will make their own terms with theories, by whomever and by whatever majorities they are held, and many will be proved wrong. But on our way to this idealistic state of tolerance the police have to deal with men as they are. The crowd mind is never tolerant of any idea which does not conform to its herd opinion. It does not want a tolerant effort at meeting of minds. It does not know the futility of trying to mob an idea. Released from the sense of

personal responsibility that would restrain even the worst individuals in it if alone and brave with the courage of numbers, both radical and reactionary mobs endanger liberty as well as order. The authorities must control them and they are entitled to place some checks upon those whose behavior or speech calls such mobs into being. When the right of society to freedom from probable violence should prevail over the right of an individual to defy opposing opinion, presents a problem that always tests wisdom and often calls for immediate and vigorous action to preserve public order and safety.

I do not think that the Constitution of the United States denies to the states and the municipalities power to solve that problem in the light of local conditions, at least so long as danger to public order is not invoked in bad faith, as a cover for censorship or suppression. The preamble declares domestic tranquility as well as liberty to be an object in founding a Federal Government and I do not think the Forefathers were naive in believing both can be fostered by the law.

Certain practical reasons reinforce the legal view that cities and states should be sustained in the power to keep their streets from becoming the battleground for these hostile ideologies to the destruction and detriment of public order. There is no other power that can do it. Theirs are the only police that are on the spot. The Federal Government has no police force. The Federal Bureau of Investigation is, and should remain, not a police but an investigative service. To date the only federal agency for preserving and restoring order when local authority fails has been the Army. And when the military steps in, the court takes a less liberal view of the rights of the individual and sustains most arbitrary exercises of military power. See *Korematsu* v. *United States*, 323 U. S. 214. Every failure of local authority to deal with riot problems results in a demand for the

establishment of a federal police or intervention by federal authority. In my opinion, locally established and controlled police can never develop into the menace to general civil liberties that is inherent in a federal police.

The ways in which mob violence may be worked up are subtle and various. Rarely will a speaker directly urge a crowd to lay hands on a victim or class of victims. An effective and safer way is to incite mob, action while pretending to deplore it, after the classic example of Antony, and this was not lost on Terminiello. And whether one may be the cause of mob violence by his own personification or advocacy of ideas which a crowd already fears and hates, is not solved merely by going through a transcript of the speech to pick out "fighting words." The most insulting words can be neutralized if the speaker will smile when he says them, but a belligerent personality and an aggressive manner may kindle a fight without use of words that in cold type shock us. True judgment will be aided by observation of the individual defendant, as was possible for this jury and trial court but impossible for us.

There are many appeals these days to liberty, often by those who are working for an opportunity to taunt democracy with its stupidity in furnishing them the weapons to destroy it as did Goebbels when he said: "When democracy granted democratic methods for us in the times of opposition, this [Nazi seizure of power] was bound to happen in a democratic system. However, we National Socialists never asserted that we represented a democratic point of view, but we have declared openly that we used democratic methods only in order to gain the power and that, after assuming the power, we would deny to our adversaries without any consideration the means which were granted to us in the times of [our] opposition." 1 *Nazi Conspiracy and Aggression* (GPO, 1946) 202, Doc. 2412–PS.

Invocation of constitutional liberties as part of the strategy for overthrowing them presents a dilemma to a free people which may not be soluble by constitutional logic alone.

But I would not be understood as suggesting that the United States can or should meet this dilemma by suppression of free, open and public speaking on the part of any group or ideology. Suppression has never been a successful permanent policy; any surface serenity that it creates is a false security, while conspiratorial forces go underground. My confidence in American institutions and in the sound sense of the American people is such that if with a stroke of the pen I could silence every fascist and communist speaker, I would not do it. For I agree with Woodrow Wilson, who said:

> "I have always been among those who believed that the greatest freedom of speech was the greatest safety, because if a man is a fool, the best thing to do is to encourage him to advertise the fact by speaking. It cannot be so easily discovered if you allow him to remain silent and look wise, but if you let him speak, the secret is out and the world knows that he is a fool. So it is by the exposure of folly that it is defeated; not by the seclusion of folly, and in this free air of free speech men get into that sort of communication with one another which constitutes the basis of all common achievement." Address at the Institute of France, Paris, May 10, 1919. 2 *Selected Literary and Political Papers and Addresses of Woodrow Wilson* (1926) 333.

But if we maintain a general policy of free speaking, we must recognize that its inevitable consequence will be sporadic local outbreaks of violence, for it is the nature of men to be intolerant of attacks upon institutions, personalities and ideas for which they really care. In

the long run, maintenance of free speech will be more endangered if the population can have no protection from the abuses which lead to violence. No liberty is made more secure by holding that its abuses are inseparable from its enjoyment. We must not forget that it is the free democratic communities that ask us to trust them to maintain peace with liberty and that the factions engaged in this battle are not interested permanently in either. What would it matter to Terminiello if the police batter up some communists or, on the other hand, if the communists batter up some policemen? Either result makes grist for his mill; either would help promote hysteria and the demand for strong-arm methods in dealing with his adversaries. And what, on the other hand, have the communist agitators to lose from a battle with the police?

This Court has gone far toward accepting the doctrine that civil liberty means the removal of all restraints from these crowds and that all local attempts to maintain order are impairments of the liberty of the citizen. The choice is not between order and liberty. It is between liberty with order and anarchy without either. There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact.

I would affirm the conviction.

MR. JUSTICE BURTON joins in this opinion.