WILKINSON, Circuit Judge,'
with whom AGEE, Circuit Judge, joins, concurring in part and dissenting in part:
The remarks alleged in this Title VTI action are ones that Americans of every race and all walks of life would find so wounding that the word offensive does not begin to describe them. It is incidents such as these, small as they may appear, *289 that prevent our larger society from becoming the place of welcome it needs to be.
The good done by the civil rights laws has been enormous and one aim of those laws, as I understand it, is to make the workplace an environment where Americans of every race, religion, sex, or national origin would actually want to work. 42 U.S.C. § 2000e-2 and 2000e-3.
To say that a good workplace environment is poisoned by the kind of remarks alleged here is an understatement. Who would wish to get up and come to work each morning fearful of encountering this sort of slur during the course of the working day?
There is a countervailing danger at play in these cases, however, namely that we not imbue the workplace with such stringent hostile ' work environment requirements that employers become speech police, that employees are estranged from one another, and that companies become private sector analogues of the surveillance state.
Where and how to strike the balance? In this case I would decline to hold the employer vicariously liable on the merits of the hostile work environment claim, but I would allow Boyer-Liberto’s retaliation claim to proceed. In fact, were the truth of her complaint ascertained by the employer, the “retaliation” should have taken the form of Clubb’s dismissal and not Boyer-Liberto’s.
I.
As to the merits of the hostile work environment claim, I would affirm the judgment of the district court on the grounds that any other result would stretch the notion of vicarious employer liability past the breaking point. There may be an understandable temptation to land hard on this employer, but there are dangers down the road. Holding employers liable for remarks made by one of their employees where the majority points to no prior notice to the employer and no prior employer awareness of Clubb’s racist tendencies is all too open-ended. To be sure, an employer is “directly liable” for a coworker’s unlawful harassment if “the employer was negligent with respect to the offensive behavior.” Vance v. Ball State Univ., — U.S. -, 133 S.Ct. 2434, 2441, 186 L.Ed.2d 565 (2013). But while the majority tries to make it appear as though some other evidence of employer malfeasance may be somewhere in the offing, see Maj. Op. at 281 n. 4, its opinion is wholly focused on the two incidents and remarks at issue and intent on directing a trial where the element of imputed employer liability has not been placed genuinely in dispute.
Whatever hazy ground Clubb may occupy between co-worker and supervisor, the hazards of imposing employer liability for remarks made by mid-level workers in workforces that might number in the hundreds or even thousands pushes imputed liability well beyond the more cabined circumstances of physical injury and actual adverse employment actions such as failures to promote or discharge. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). In this case, there were roughly seventy-five people in the hotel’s food and beverage department alone. J.A. 135.
Having liability hinge upon utterances, of which companies have no prior awareness and which no victim has yet reported to them, poses more than the threat of open-ended liability. Because liability hinges on unanticipated utterances, it will tend to drive employers as a protective measure into the role of censors of all speech that even conceivably could give offense. Faragher v. City of Boca Raton, *290 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (rejecting employer liability for “the sporadic use of abusive language, gender-related jokes, and occasional teasing” (citation and quotation marks omitted)). We may assuredly expect the arrival of workplace speech codes, which, if not already present, will not be long in coming. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (noting that Title VII was not meant to be “a general civility code for the American workplace”). Such a heavy employer hand is a high price to pay for the majority’s holding, and it is one that is not congruent with Supreme Court rulings or consistent with our freedoms.
II.
As to the Title VII retaliation claim, an employee must show that her belief that a hostile work environment exists or is coming into existence is objectively reasonable. See Clark Cnty. Sch. Dish v. Breeden, 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (applying the objective standard); EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406-07 (4th Cir.2005).
Under the circumstances presented here, Liberto’s belief that a hostile work environment existed or was coming into existence was objectively reasonable. The words alleged to have been spoken by Clubb were abhorrent. Moreover, Clubb uttered the epithet on separate occasions and directed it personally at Liberto. And the entire course of conduct surrounding the offensive remarks was abusive. This conduct on the part of Clubb was enough to bring Boyer-Liberto under the protection of the anti-retaliation provision of Title VII when she reported it. An employee is not an expert in hostile work environment law. Any reasonable person must feel free to report this sort of vilification without being subject to retaliatory actions. An employee must feel safe and secure in bringing an incident of this nature to the attention of management.
Any decent management, moreover, would seemingly wish to know of such an occurrence under its roof. Employers must have complaint procedures for employees to utilize at an early stage-before harassing environments intensify and spread. See Faragher v. City of Boca Raton, 524 U.S. 775, 806-08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Employers are due adequate notice so that they may head off both the hostile work environment and any resultant liability. Employees benefit when an emergent hostile work environment is nipped in the bud.
But here, too, there is a balance to be struck. The annual number of Title VII retaliation charges filed with the EEOC has nearly doubled since the late 1990s. Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. -, 133 S.Ct. 2517, 2531, 186 L.Ed.2d 503 (2013). Perhaps American employers have become twice as likely to retaliate against employees since 1997, but I doubt it. One cause of the dramatic increase of retaliation claims may very well be a sub voce chipping away at the objectively reasonable belief standard. See Id. at 2531-32 (suggesting that “lessening the causation standard” for retaliation claims “could also contribute to the filing of frivolous claims”). The majority’s approach may very well “raise the costs, both financial and reputational, on an employer” where there is no true objectively reasonable belief in the existence of a hostile workplace. Id. at 2532.
The dangers of allowing the objective standard to slip, however, go far beyond the financial and reputational costs to companies. Two severe, if subtle, side effects *291 warrant discussion: the trammeling of free speech and the construction of workplace barriers between the races and sexes..
A.
If courts lessen their insistence on an objectively reasonable belief in a hostile environment and permit the reporting of all manner of perceived slights to warrant Title VII protection, we become party to the creation of the workplace as a zone where First Amendment values have ceased to be observed. In the context of a hostile work environment claim, it is “crucial” to use an objectively reasonable person standard “to ensure that courts and juries do not mistake ordinary socializing in the workplace” for actionable discrimination. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The same is true for retaliation claims.
People will — and should — discuss controversial matters at work. Some of those subjects may well pertain to race and gender. Disagreement on these and other matters may be heated and robust, but it should not on that account be reportable. People may also say offensive things in the workplace. Distasteful, even offensive, speech is unfortunate but it is often a “necessary side effect[] of the broader enduring values” that the First Amendment protects. Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). The premise of the First Amendment is that we as a people not leap quickly to suppression, see Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), which may well occur if reportage and punishment for mere speech is an omnipresent possibility.
The remarks alleged here reached the point of abusiveness accompanied by threatening and intimidating body language. Clubb approached so closely that Boyer-Liberto “could feel her breath” and the shouting caused Clubb to “spit on [her] face.” J.A. 241.
Actions are one thing. The greater danger lies in predicating liability on remarks. Not here, because Clubb’s language, to say the very least, played “no essential' part [in] any exposition of ideas.” Chaplinksy v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). But there will be many instances of uncomfortable workplace speech that cannot on that basis be deemed actionably hostile. It has always been the case that “[t]o justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced.” Whitney v. California, 274 U.S. 357, 376, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Bran-déis, J., concurring) (emphasis added). A central “function of free speech under our system of government is to invite dispute.” Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Unless the “evil” is “imminent ..., the- remedy to be applied is more speech, not enforced silence.” Whitney, 274 U.S. at 377, 47 S.Ct. 641 (Brandéis, J., concurring). More speech means insensitive expression in the workplace should be countered and denounced as such. But the bedrock meaning of the First Amendment will be lost if the expression of disfavored or objectionable positions on sensitive and volatile issues become subjects of reportage and sanction. If every co-worker becomes a potential informant, does this environment not in time come to resemble societies other than our own?
Anti-discrimination initiatives need not be at war with free speech. The values protected by the Fourteenth Amendment need not be inconsistent with those safeguarded by the First. Good things happen when people, in this case company employees, talk things out among themselves. *292 Collective discourse and decision-making is a matter the First Amendment holds dear. Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting) (noting that “the ultimate good desired is better reached by free trade in ideas — that the best test of truth is the power of the thought to- get itself accepted in the competition of the market”). I agree with the majority that “early reporting [is] vital to achieving Title VII’s goal of avoiding harm.” Maj. Op. at 283. But the majority nowhere acknowledges the dangers of over-reporting. It drifts ever so casually toward draconian consequences for mere utterance and speech. Such blindness to First Amend'ment values bespeaks a lack of faith in lateral discussions which would no doubt lead nowhere in the case of Clubb and plaintiff, but which may be far preferable to hair-trigger reporting in working out the misunderstandings that occur in every workplace.
Workplaces in their' own way are our town squares. John talking to Kathy may prove in the end more fruitful than John running to a higher authority to have Kathy’s point-of-view condemned. An objective test, not a subjective standard geared to the most heightened sensibilities, best preserves the balance between free speech and anti-discrimination law. The fact that some incidents, as here, are plainly beyond the pale does not mean we surrender hope in other instances of workers reaching humane understandings in discussions with themselves. Turning someone in as a course of first resort or on insubstantial grounds may perpetuate resentment and bring the prospect of employee dialogue to a premature end.
The law of hostile environments is not anchored in any specific statutory provision. Rather, it was derived from Title VII’s general prohibition of discrimination, Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and kept in proper perspective, it helps prevent companies from becoming intolerable places for racial, ethnic, and other minorities to work. Hostile environment doctrine has also been judicially, developed almost in the manner of federal common law. It would be wrong not .to infuse this development with one of the greatest of our enumerated constitutional values, that of freedom of speech. Especially when the speech concerns current affairs or other public issues, courts must take notice. See Snyder v. Phelps, 562 U.S. 443, 131 S.Ct. 1207, 1215-16, 179 L.Ed.2d 172 (2011). The framers “believed ... that public discussion is a political duty.” Whitney, 274 U.S. at 375, 47 S.Ct. 641 (Brandeis, J., concurring). Civic health requires that Americans not be fearful of their freedoms, whether in public or private venues, and especially a freedom so precious as the exercise of speech. The majority unfortunately takes less than token recognition of this value. It does not herald for future courts the dangers of taking the American workplace down a more autocratic path.
B.
The objects of civil rights laws are to eliminate discrimination, bring Americans together, and break down barriers. This purpose remains crucial, as Congress has repeatedly attested. And yet our schools are resegregating. Our neighborhoods in all too many instances are very far apart. The workplace may be where racial interactions are most frequent, and it will be sad if law pushes this last remaining venue into the more separatist habits that elsewhere too frequently prevail.
Title YII guards against this. Title VII will be counterproductive, however, if it countenances workplaces over-reliant on *293 employee surveillance and reportage. Such a system erects barriers rather than dismantles them. In an ideal world, the races and sexes would interact spontaneously, in natural and creative ways. There would be no single correct way to behave around, no single correct thing to say to, a worker of another race or gender. We are people — human beings — with commonalities far more profound than superficial differences.
The majority surely agrees. Yet by focusing on sick “bigots” who “belittle racial minorities,” Maj. Op. at 282 (quoting Jordan v. Alt. Res. Corp., 458 F.3d 332, 353—54 (4th Cir.2006) (King, J., dissenting)), the majority sells the more generous potential of most Americans short.
Title VII must not contribute an added element of inhibition when we communicate with those of another sex or race. And yet I fear that is precisely what will happen if the objectively reasonable standard is diluted in favor of retaliation protection for any report, however marginal, trivial, or unsubstantiated. The Supreme Court has made clear that Title VII’s “prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace.” Oncale, 523 U.S. at 81, 118 S.Ct. 998. But where every ambiguous or unintentionally insensitive remark is going to be reported upstairs, employees naturally will seek to cluster with those who look, act, and think “like themselves.” Instead of an interactive community in which individual attributes can be recognized, understood, celebrated, and embraced, the result will be a more fractious and walled-off working environment where noxious stereotypes persist. Keeping interracial distance and maintaining interracial silence will become the safest course, the easiest way to avoid a blot on one’s record that comes even with a co-worker’s erroneous report. This road is in no one’s interest, certainly not ours as a nation or as individuals in the simple search for friends. We must not become others to ourselves.
III.
The search for balance is important in law, lest the aims of one of America’s greatest Acts be compromised by a needlessly censored and suspicious workplace. I believe the majority is right in allowing plaintiffs retaliation claim to proceed, but wrong in not affirming the district court on the merits of the Title VII claim. More than that, I regret that my friends in the majority did not do more to recognize that this is an equation with two sides, an area with more than one dimension. The harmony of balance is nowhere to be found.