CITY OF CINCINNATI, APPELLEE, *v.* BLACK, APPELLANT.

[Cite as City of Cincinnati v. Black, 8 Ohio App. 2d 143.]

(No. 9754—Decided June 13, 1966.)

*Mr. Ralph Cors* and *Mr. Stephen Cohen,* for appellee.
*Mr. J. B. Stoner* and *Mr. Charles F. Buck,* for appellant.

HOVER, J. Appellant, defendant below, was convicted in the Municipal Court of Cincinnati of violating Section 901-s3 of the Ordinances thereof. The section is entitled "Scurrilous Pamphlet" and reads as follows:

"Whoever shall offer for sale or sell or give away any pamphlet or paper which contains an article or articles subjecting to ridicule or contempt any class or group of citizens on account of its or their race or religious belief, or which in any manner tends to promote racial hatred or religious bigotry, shall be fined not exceeding fifty dollars ($50.00)."

The specific charge was that the appellant "unlawfully gave away pamphlets and papers subjecting certain classes of citizens to ridicule on account of their race and religious beliefs, which literature also tends to promote racial hatred and religious bigotry."

The case was tried to the court, the defendant not being constitutionally entitled to a jury. Upon trial he was convicted

and fined. He did not offer any defense, relying solely upon the claim that the ordinance abridged his constitutionally protected rights under the First and Fourteenth Amendments of the federal Constitution.

The evidence is quite simple. Police visited the office of the National States Rights Party in the city of Cincinnati, requested any literature available for distribution, and received from the defendant various items of printed material collectively identified in the record as Exhibit No. 3. The court found, without specifying which, that certain portions of the material included in Exhibit No. 3 were scurrilous. If such a finding were to be taken as the only basis for the conviction, the judgment would be obviously invalid for the reason that the word "scurrilous" appears only in the title of the ordinance. The title of the legislative act cannot be deemed to constitute the act itself. There is nothing scurrilous in the material as that phrase is defined by law. (See 38 Words and Phrases 371, and, more particularly, *Brown* v. *Lamb,* 112 Ohio App. 116.) However, the affidavit does charge an offense in the words of the body of the ordinance, and we must assume that the trial court considered the charge in relation to the affidavit and the prohibited act rather than its title description. The ordinance actually defines two offenses, and the affidavit alleges violation of both its branches. The ordinance makes it an offense to give away pamphlets subjecting to ridicule or contempt a class or group of citizens on account of race or religious belief. The ordinance also makes the act unlawful if the pamphlet tends to promote racial hatred and religious bigotry irrespective of any contempt or ridicule.

Since the court did not specify what portion or portions of the allegedly unlawful material constituted the violation, some consideration of Exhibit No. 3, upon which the conviction is based, is necessary. Although the material is too extensive to justify complete reproduction here, it may be described generally as follows:

1. A tabloid-style newspaper entitled "The Thunderbolt" consisting of twelve pages;

2. A printed sheet of paper entitled "Propagandists Conceal Facts on Race." Subheadings are "Free Discussion of Race Question is Prevented" and "Scientist Reveals That Negro Blood Differs From White." It carries pictures of an

Australian Bushman and a South African Hottentot, which purport to show physical characteristics unique to such groups. It also carries a photograph of a boy and a woman, the boy allegedly being afflicted with "Sickle Cell" which is described as a blood disease peculiar to one race;

3. A mimeographed compilation entitled "Arrest by Race, 1956, as Reported by The FBI." This purports to demonstrate a disproportionate percentage of arrests for various major and minor crimes in one racial group;

4. A mimeographed paper entitled "The Truth About Those Negro Heroes" purporting to demonstrate by numbers and by attributed quotation that the racial group mentioned is lacking in military reliability, discipline and courage;

5. This appears to be a reprint of a news article appearing in the Chicago Tribune November, 1963. The article is headlined "Negro League Aids Indicted in Extortion."

All the material carries the stamped imprint of the National States Rights Party at the business address where it was received incident to the present prosecution.

The principal part of the exhibit is "The Thunderbolt" (No. 1 above). This has the form and appearance of a tabloid newspaper. It claims to be "the official white racial organ of the National States Rights Party." It is apparently published monthly in Birmingham, Alabama. It cannot be reproduced in full here but it can be somewhat abstracted. The lead article concerns the McCarran-Walter Immigration Bill and pending legislation before the Congress to amend the existing law to eliminate immigration quotas. The amendments have since become law. The article sets out, as its principal objection to the proposed changes, that persons of one religious or cultural group will be the primary beneficiaries thereof. It alleges that as amended the law would tend to encourage the migration of Communist citizens of one religious belief to this country. It urges persons to write their Congressmen.

The other article on the front page urges withdrawal from the United Nations on grounds related to race and religion. Also included in the exhibit is an article relative to the presence of Negroes in the United States Senate and House during reconstruction days. It forecasts the possibility of Negroes again being elected to important positions in government.

Another article alleges that certain food producers refused

to reveal the amounts paid religious officials for special foods. Another article points out the possible effect of federal voting registrars in southern states. Another article points out that persons can be hired and fired on the basis of race prior to the effective date of Civil Rights Laws. Another, that the Republican Party can be expected to nominate a Negro for the office of Vice President. Another article advocates confiscation of the property of a religious group and its redistribution.

The entire publication is a hodgepodge of racial, religious and political discussions and questions with emphasis on Negroes as a race and Jewish people as a religious group. It solicits membership in the National States Rights Party. It includes a news article concerning demonstrations by the party in Cincinnati against a Soviet medical exhibit at Music Hall—an incident that was covered in depth by news media.

The constitutional question is fairly presented by the record and requires a consideration again of the extent to which criminal sanctions may be enforced in spite of the guarantee of free press, free expression, and free assembly in both the federal and state Constitutions. Before passing to this question, however, it should be noted that the National States Rights Party is not a figment of some propagandist's imagination. Such a political party does exist, however insignificant, however extremist, and however counter it might be to the political beliefs and activities of overwhelming millions of citizens. As late as the 1964 presidential election this party received a recordable number of votes in three states where it was recognized. The fact that it is not an officially recognized party in the state of Ohio, where only two parties are recognized, will have no impact on the right to meet, speak and proselytize legally in this state and in the city of Cincinnati.

It is thus seen that the ordinance undertakes to control the extent of free expression in the fields of religious and political affairs, two fields which have been given the widest possible latitude by constitutional interpretation; and also in the field of race relations which, while not written directly into either the federal or state Constitutions, has nevertheless in present day society, by judicial interpretation of the Fourteenth Amendment and by legislative enactment, received wide-spread public attention. The ordinance makes it an offense to communicate

hatred and bigotry in the fields of race and religion. Bigotry and hatred reflect a mental attitude which does not necessarily become translated into human behavior. Great honor is almost universally paid to the special commandment ''that ye love one another,'' but no means has as yet been found or attempted to compel this highly commendable viewpoint by law. Obviously any attempt to do so would border very closely on thought control which is resisted (even to the extent of permitting bigotry and intolerance) by every legal precept we know.

The principle is aptly expressed by Jefferson's statement inscribed in the monument to his memory in the national capital—''I have sworn upon the altar of God eternal hostility against every form of tyranny over the mind of man.'' The tyranny over the mind of man, however misguided or myopic that mind may be, becomes no less, even if it takes the form of meaning that, while one may think as he wishes, he may not communicate his evil or unsocial or intolerant thoughts to another, particularly on the subject of race or religion, and most particularly not in the city of Cincinnati where there is an ordinance making any such written communication a crime.

Because one may not be criminally prosecuted for expressing feelings or convictions—even strong disapproval or intolerance of another because of his or his group's particular status —it does not mean that it is impossible to limit the right of free speech. Such areas of limitation however, both under the federal and state Constitutions, are exceedingly narrow, particularly when applied outside the area of individual libel and slander. Various general guide lines on allowable infringements in the particular fields of race and religion with which we are here concerned do exist. For instance, the constitutional protection does not depend upon the truth, popularity or social utility of the ideas and beliefs put forward. (*Craig* v. *Harney*, 331 U. S. 367; *NAACP* v. *Button, Atty. Genl.*, 371 U. S. 415.) The power to regulate must not unduly infringe upon the constitutional right of comment and expression. (*Cantwell* v. *Connecticut*, 310 U. S. 296; *NAACP* v. *Alabama, ex rel. Patterson*, 357 U. S. 449; *Bates* v. *City of Little Rock*, 361 U. S. 516.) Nor will community customs or traditions justify infringement. (*Eubanks* v. *Louisiana*, 356 U. S. 584; *Cooper* v. *Aaron*, 358 U. S. 1.)

Certain infringements have been permitted in narrow fields

by the law of Ohio, and certain others not prohibited. Section 2901.37 of the Revised Code makes libel a crime, but recognizes necessarily allowable defenses. (See *Davis* v. *State*, 118 Ohio St. 25; *American Cancer Society, Inc.*, v. *City of Dayton*, 160 Ohio St. 114.)

The courts have been particularly zealous to permit the widest possible latitude of comment on religious and political affairs. *De Jonge* v. *Oregon*, 299 U. S. 353, reversed a state conviction under its criminal syndicalism law as applied to a public meeting promoted by an organization which advocated the use of violent or other unlawful methods to effect political change. The court held that a state Legislature (and this would certainly apply with equal force and effect to a city council) may protect against abuses of free speech and assembly by dealing with the abuses, but the rights themselves must not be curtailed. The court stated, at page 364:

"These rights may be abused by using speech or press or assembly in order to incite to violence and crime. The people through their legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed. The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government."

That case, incidentally, would overrule the 1920 decision of this very court, wherein it was held in *Burke* v. *American Legion of Ohio*, 14 Ohio App. 243, that the distribution of Communist literature was an act of criminal syndicalism which placed the persons so doing beyond the protection of the civil law.

In *Cantwell* v. *Connecticut*, 310 U. S. 296, a state law requiring a license to solicit for a religious cause was held violative of the First and Fourteenth Amendments even though the

solicitation included harsh and annoying criticism of a particular religion. A unanimous court stated categorically on page 307, that "The fundamental law declares the interest of the United States that the free exercise of religion be not prohibited and that freedom to communicate information and opinion be not abridged." The court in that case takes cognizance of the fact that certain acts coupled with a breach of the peace or a clear threat to public safety might, under some circumstances, justify the infringement.

In *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, the court held that a New Hampshire law forbidding speaking "any offensive, derisive or annoying word [again unwelcome and derogatory religious comment] to any other person who is lawfully in any street or other public place * * * or [to] call him by any offensive or derisive name" was constitutional only to the extent that it was limited to "the use in a public place of words directly tending to cause a breach of the peace by provoking the person addressed to acts of violence."

In *Terminiello* v. *Chicago,* 337 U. S. 1, the court was concerned with a city ordinance under which the defendant was charged with breach of the peace because of an inflamatory speech on the subject of race and religion. In that case the facts were such that while the inflamatory and defamatory speech was being made a riot was underway outside the building. A sharply divided court reversed the conviction because the trial court charged the jury that a breach of the peace consisted of misbehavior which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance."

Three years later, by an equally sharp division, the Supreme Court of the United States, in *Beauharnais* v. *Illinois,* 343 U. S. 250, approved a conviction for criminal libel. That case will be discussed further below. However, as late as 1963 the court, in a six to three decision, invalidated a Virginia law in *NAACP* v. *Button, Atty. Genl.,* 371 U. S. 415, which sought to place unconstitutional restriction on the named organization's right to freedom of assembly and freedom of speech because it encouraged legal actions pertaining to racial discrimination, urged the institution of suits to challenge racial discrimination, offered the services of attorneys selected and paid by it and its affiliates, and controlled the conduct of such litigation. Such ac-

tivities, it was held, were protected by the First and Fourteenth Amendments, and the attempt of the state of Virginia to control such activities by virtue of its authority to control the practice of the legal profession was held unconstitutional.

The court reiterated the same general line of thinking in *New York Times Co.* v. *Sullivan*, 376 U. S. 254. Mr. Justice Brennan's opinion in that case takes note of the first collision in our national history between the concept of free expression, particularly in the political arena, and the reaction of a government overly sensitive to such comment. He traces the sorry history of the Sedition Act of 1798 which "first crystallized a national awareness of the central meaning of the First Amendment." Congress made it a crime to "publish * * * any false, scandalous and malicious writing or writings against the government of the United States * * * with intent to defame * * * or to bring * * * into contempt or disrepute, or to excite against * * * [the government, Congress or the President] the hatred of the good people of the United States."

The Justice points out that while convictions were had and fines levied pursuant to the statute, the Act in question expired three years after its passage and the many convictions had were not tested constitutionally. It is observed, however, that a subsequent Congress repaid the fines that had been levied in the Sedition Act prosecutions. It was, in fact, this Act which evoked from Jefferson his quoted words above on tyranny over the mind of man. The Act also had the effect politically of destroying the then Federalist Party which never again became a serious factor in national political affairs.

Most recently, in *Garrison* v. *Louisiana*, 379 U. S. 64, the court reversed a conviction under the Louisiana criminal defamation statute, on the ground that it invaded the area of free and allowable comment on public affairs.

In support of the wide latitude of freedom of speech and assembly in this particular area, Mr. Justice Douglas attached to his concurring opinion a lengthy excerpt from an impassioned and inspired address by James Madison on the tragic and dangerous effects of the Sedition Act mentioned above. One paragraph from the excerpt referred to serves to illustrate the problem:

"* * * That this *liberty* is often carried to excess; that it has

sometimes degenerated into *licentiousness,* is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.* No regulations exist which enable the Government to suppress whatever calumnies or invectives any individual may choose to offer to the public eye, or to punish such calumnies and invectives otherwise than by a legal prosecution in courts which are alike open to all who consider themselves as injured.''

The sole case which needs further examination in this field is the one which most closely supports the present conviction, *Beauharnais* v. *Illinois,* 343 U. S. 250. The court was concerned with a defendant who was convicted on a charge of distributing antiNegro leaflets on the streets of Chicago contrary to an Illinois statute which made it a crime to exhibit in any public place, any publication which ''portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed or religion,'' which ''exposes the citizen of any race, color, creed or religion to contempt, derision, or obloquy.''

Again, four of the Justices disagreed strenuously with the determination of the majority that the Illinois statute ''as construed and applied in this case'' did not infringe the constitutional right of free speech and free assembly. That case is obviously pertinent to the present question and, in fact, is the only one we have been able to find which deals with criminal libel as applied to groups or ''collectivisms.'' It is not cited by either the appellant or appellee, or by the *amicus curiae.* It would seem, however, that the appellee city must be aware of the case, since an ordinance passed by its council subsequent to the present conviction and described as supplementary to the specific charge with which we are here concerned copies word for word the Illinois statute construed in the *Beauharnais case.* The opinion of the divided court delivered by Mr. Justice Frankfurter, after reviewing many of the related previous cases including some of those herein cited above, states that the question to be determined was whether the protection afforded by the Constitution prevents the state from punishing the libels—such

as calling individuals rapist, or robber, or a carrier of knives and guns and the user of marijuana—and may also, by the criminal statute, extend such prohibition when the libel is directed "at designated collectivities and flagrantly disseminated." The court states in this respect, "if an utterance directed at an individual may be the object of criminal sanctions, we cannot deny to a state power to punish the same utterance directed at a defined group, unless we can say that this is a wilful and purposeless restriction unrelated to the peace and well-being of the state."

The court then proceeds to trace the historical experience of the state of Illinois in public disorders having a racial basis; from the murder of abolitionist Lovejoy in 1837 through a race riot in 1900 in Springfield, one in 1917 in East St. Louis, another in 1919, on through to the Cicero riots in 1951. It may well have added the expulsion of Mormons from Illinois and the destruction of their towns in 1846 as a similar example of religious bigotry which erupted into violence.

The court states, "we would deny experience to say that the Illinois legislature was without reason in seeking ways to curb false or malicious defamation of racial and religious groups, made in public places and by means calculated to have a powerful emotional impact on those to whom it was presented."

The court observes further in referring to *Terminiello* v. *Chicago,* 337 U. S. 1, decided three years earlier, that "Even the latter case did not hold that the unconstitutionality of a statute is established *because* the speech prohibited by it raises a ruckus." The court might have added that in *Terminiello* the conviction was not valid even though the vilification and defamation encouraged and actually caused a breach of the peace.

It is pointed out in a dissenting opinion by Mr. Justice Black that the statute is actually a "group libel law." It is stated that "this label may make the court's holding more palatable for those who sustain it, but the sugar-coating does not make the censorship less deadly * * * For as 'constitutionally recognized' that crime has provided for punishment of false, malicious, scurrilous charges against individuals, not against huge groups. * * * Every expansion of the law of criminal libel so as to punish discussions of matters of public concern means a corresponding invasion of the area dedicated to free expression by the Frst Amendment."

In *Garrison* v. *Louisiana,* 379 U. S. 64, it is said of *Beauharnais* v. *Illinois,* 343 U. S. 250, in a concurring opinion by Mr. Justice Douglas, that it was "a case decided by the narrowest of margins, should be overruled as a misfit in our constitutional system and as out of line with the dictates of the First Amendment. I think it is time to face the fact that the only line drawn by the Constitution is between 'speech' on the one side and conduct or overt acts on the other."

As pointed out hereinabove, this becomes particularly pertinent and important when dealing with First Amendment rights to which the courts have accorded specific and particular attention, to wit, the right of a free press, the right of almost unrestrained political comment, the right of religious agreement or disagreement, and the right of free assembly for lawful purposes.

The almost unlimited freedom of press for comment on public and governmental questions was again reiterated by the Supreme Court of the United States as recently as May 23, 1966, in *Mills* v. *Alabama* (No. 957, October Term 1965), 382 U. S. 936, as follows:

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes. The Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars, see *Lovell* v. *Griffith,* 303 U. S. 444, to play an important role in the discussion of public affairs. * * *"

The concurring opinion of Mr. Justice Douglas is even more pointed:

"* * * where First Amendment rights are jeopardized by a state prosecution which, by its very nature, threatens to deter others from exercising their First Amendment rights, a federal court will take the extraordinary step of enjoining the state prosecution. * * * Our observation in *NAACP* v. *Button,* 371 U. S. 415, 433, has grim relevance here: 'The threat of sanctions may deter * * * exercise [of First Amendment rights] almost as potently as the actual application of sanctions.' "

If it be necessary to draw a technical distinction between the present city ordinance and the decision in the *Beauharnais case,* it is merely pointed out that that case, as well as various other opposing but related cases, define and concern themselves with an alleged clear and present danger to the peace and welfare of the community, and most particularly with activities carried on in a public place, neither of which conditions accompany this conviction. The Cincinnati ordinance in question takes cognizance of neither limitation and, consequently, cannot be judged and interpreted in the manner of *Beauharnais* v. *Illinois* which, as pointed out above, is as close as the Supreme Court has come to upholding a collective type of criminal sanction and which has been consistently criticized since its pronouncement.

Accordingly, it is the opinion of this court that the above ordinance is an unconstitutional invasion of both the state and federal Constitutions in the realm of freedom of speech and press, freedom of religion, and freedom of assembly. This does not mean that the material distributed by the defendant herein upon specific request of police officers and in his own place of business receives even remotely the approval of this court as to either purpose or subject matter. It is not unfitting to observe that, fortunately, in the minds of the overwhelming millions of citizens much of the material is ridiculous rather than ridicule. As indicated by President Madison, above, it can only be hoped that full and fair comment on social conditions and public affairs is the greatest possible safeguard to the freedom of all.

The judgment is reversed, and the defendant ordered dismissed.

*Judgment reversed.*

HILDEBRANT, P. J., and LONG, J., concur.